## REVOLVING CREDIT AGREEMENT

THIS REVOLVING CREDIT AGREEMENT, dated effective as of December 18 2014, is entered into between **NBI PROPERTIES, INC.** and **N B I SERVICES, INC.**, each an Oklahoma corporation (individually and collectively, the "Borrower"), the Lenders signatory parties hereto (collectively, the "Lenders") and **CROSSFIRST BANK**, a state banking corporation, as administrative agent and collateral agent for the Lenders signatory hereto from time to time (the "Agent").

RECITALS:

A.      Borrower has requested the Lenders and the Agent to refinance Borrower's existing revolving credit facility with its existing group of lenders (the "Existing Lenders") by establishing in favor of the Borrower a revolving line of credit facility in the maximum amount of $75,000,000.00, subject to the Revolver Commitment Amount (initially stipulated to be $50,000,000.00) until December 15, 2016 (the "Revolving Credit Commitment"), to be evidenced by Borrower's promissory notes payable to the order of the Lenders and dated as of even date herewith (collectively, the "Revolver Notes"), the proceeds of which are to be used for, among other things, (a) refinancing the existing aggregate outstanding principal balance of the promissory notes issued to the Existing Lenders and all undrawn amounts on unexpired letters of credit issued thereby as of the Closing Date, (b) acquisition of oil and natural gas reserves, (c) funding work-overs, enhancements and development of oil and gas properties in the normal course of business, (d) general working capital and oil and gas capital expenditures, and (e) issuance of standby letters of credit required in Borrower's business operations; and

B.      Lenders are willing, by this Revolving Credit Agreement, to establish in favor of Borrower the Revolving Credit Commitment for two (2) years until December 15, 2016, in the maximum outstanding principal amount of $75,000,000.00 in payment and refinancing of the aggregate outstanding principal balance of the Revolving Loan made by the Existing Lenders, in favor of the Borrower and for the purposes specified in clauses (b) through (e) of Recital A above, all upon the terms and conditions herein set forth, and upon Borrower's granting in favor of Agent, for the benefit of the Lenders, a continuing and continuous first and prior mortgage lien, pledge of and security interest in certain oil and gas leasehold, mineral and mining interests, all as more particularly described and defined in the Mortgages (as hereinafter defined), as collateral and security for all indebtedness incurred pursuant to the Revolving Credit Commitment;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, receipt of which is acknowledged by the parties hereto, the parties agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

When used herein, the following terms shall have the following meanings:

2

**EXHIBIT 1**

"Adjusted Gross Proceeds" shall mean (i) all proceeds received by the Borrower during the applicable period, whether directly or indirectly, from purchasers of Hydrocarbons produced from the Mortgaged Property, plus (ii) all amounts which the Borrower was entitled to receive during such period but which were offset by the purchaser of production or an intermediary against obligations (other than ordinary operating expenses) owing by the Borrower; less the amount of all gathering, severance and windfall profits taxes required to be paid by the Borrower with respect to said proceeds and all royalty and overriding royalty payments to third parties and all ordinary and necessary operating expenses paid by the Borrower with respect to the Mortgaged Property, excluding only such expenses that (i) qualify as capitalized items under generally accepted accounting principles ("GAAP") or (ii) are defined or described in the energy industry as work-over expenses or costs.

"Affiliate" shall mean any Person which, directly or indirectly, controls, or is controlled by, or is under common control with, another Person and any partner, officer or employee of any such Persons. For purposes of this definition, "control" shall mean the power, directly or indirectly, to direct or in effect cause the direction of the management and policies of such Person whether by contract or otherwise.

"Agent" shall mean CrossFirst Bank, or its successor and permitted assigns.

"Agreement" shall mean this Revolving Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"Applicable Prime Rate" shall mean the annual rate of interest published in the "Bonds, Rates and Yields" section of the money rates column of *The Wall Street Journal (Southwest Edition)* from time to time. Such Applicable Prime Rate may be adjusted from time to time throughout the term of the Loan or Loans governed hereby and/or evidenced by the Revolver Notes, and any change in such Applicable Prime Rate due to a change in such announced and/or published rate shall be effective on the day of the announced change in such Applicable Prime Rate. Such rate shall not necessarily be its "best" or lowest rate and the Agent may make or offer loans from time to time based or priced on other rates or indices. Should the Applicable Prime Rate cease to be announced or published by the Agent or otherwise cease to be available, then the Applicable Prime Rate shall be a substitute index selected or designated by the Agent in its reasonable discretion and concerning which the Borrower shall be provided notice.

"Business Day" shall mean a day other than a Saturday, Sunday or a day upon which banks in the State of Oklahoma are closed to business generally.

"Cash Equivalents" means (a) any readily-marketable securities (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United States federal government, (b) any Dollar-denominated time deposit, insured certificate of deposit, overnight bank deposit or bankers' acceptance issued or accepted by (i) Agent or any Lender or (ii) any commercial bank that is (A) organized under the laws of the United States, any state thereof or the District of Columbia, (B) "adequately capitalized" (as defined in the regulations of its primary federal banking regulators) and (C) has Tier 1 capital (as defined in such regulations) in excess of $500,000,000

3

and (c) shares of any United States money market fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clause (a) or (b) above with maturities as set forth in the proviso below, (ii) has net assets in excess of $500,000,000 and (iii) has obtained from either S&P or Moody's the highest rating obtainable for money market funds in the United States; provided, however, that the maturities of all obligations specified in any of clauses (a) or (b) above shall not exceed 365 days.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, together with all regulations and rulings promulgated with respect thereto.

"Closing Date" shall mean the effective date of this Agreement.

"Collateral" shall have the meaning assigned to that term in Article III of this Agreement.

"Collateral Borrowing Base" shall have the meaning assigned to the term in **Section 4.1** of this Agreement.

"Default Rate" shall mean the then applicable per annum contract rate of interest specified in **Section 2.2** plus four percentage points (4%).

"EBITDAX" shall mean for any period, the sum of Borrower's consolidated net income for the period *minus* any non-recurring gains (losses) from the sale of assets (other than Hydrocarbons in the ordinary course of business), *plus* the following charges to the extent deducted from net income in such period: interest, income taxes (including franchise taxes calculated with respect to income), depreciation, depletion and amortization, and any other non-cash charges and non-cash revenues (including, by way of example and not by way of limitation, intangible drilling costs and lease impairment expenses and write downs from impairment of oil and gas properties) and after eliminating extraordinary items. In addition, for any applicable period during which an acquisition or disposition permitted by this Agreement is consummated, EBITDAX shall be determined on a pro forma basis (with such calculation to be acceptable to, and approved by, the Agent in its reasonable discretion) as if such acquisition or disposition were consummated on the first day of such applicable period.

"Environmental Laws" shall mean Laws, including without limitation federal, state or local Laws, ordinances, rules, regulations, interpretations and orders of courts or administrative agencies or authorities relating to pollution or protection of the environment (including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata), including without limitation CERCLA, SARA, RCRA, HSWA, OPA, HMTA, TSCA and other Laws relating to (i) Polluting Substances or (ii) the manufacture, processing, distribution, use, treatment, handling, storage, disposal or transportation of Polluting Substances.

"ERISA" shall mean the Federal Employee Retirement Income Security Act of 1974, as amended, together with all regulations and rulings promulgated with respect thereto.

"Event of Default" shall mean any of the events specified in **Section 8.1** of this Agreement, and "Default" shall mean any event, which together with any lapse of time or giving of any notice, or both, would constitute an Event of Default hereunder, under the Guaranties of

4

any of Richard J. Nichols, Orville B. Nichols, or Nichols Brothers, Inc. "(NB")), or such other Mortgagor Affiliates, or under any of the other Loan Documents.

"Excluded Cash" shall mean cash maintained in any of Borrower's or the Mortgagor Affiliates' bank accounts for royalty owners and other working interest owners not affiliated with Borrower or the Mortgagor Affiliates.

"Excluded Swap Obligations" (a) with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) and (b) with respect to any Borrower, any Swap Obligation of another Borrower or Guarantor if, and to the extent that, all or a portion of the joint and several liability of such Borrower with respect to, or the grant of such Borrower of a security interest to secure, as applicable, such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation, or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof), by virtue of such Guarantor's (in the case of (a)) or Borrower' (in the case of (b)) failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of such Guarantor, joint and several liability of such Borrower, or grant of such security interest by such Guarantor or Borrower, as applicable, becomes or would become effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one Swap Obligation, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swap Obligations for which such guarantee or security interest or joint and several liability, as applicable, is or becomes illegal.

"Funded Debt" shall mean, without duplication, the sum of: (i) all indebtedness of the Borrower, for borrowed money including, but not limited to, senior bank debt, senior notes, subordinated debt, bonds, debentures or similar instruments, or upon which interest payments are customarily made; (ii) the principal portion of all obligations under capital leases of Borrower; (iii) the maximum available amount of all issued and outstanding standby or other letters of credit or acceptances; (iv) all Funded Debt of another Person secured by a Lien on any property of Borrower and its subsidiaries, whether or not such Funded Debt has been assumed; and (v) contingent obligations of Borrower and its subsidiaries, for Funded Debt of the types described in clauses (i) through and including (v) above.

"Funded Debt to EBITDAX Ratio" shall mean, as of any quarterly calculation date, the ratio of (i) Borrower's Funded Debt to (ii) Borrower's EBITDAX for the then most-recently ended fiscal quarter (on an annualized basis).

"Guaranty Obligation" as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or

5

indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. For the avoidance of doubt, for purposes of determining any Guaranty Obligations of any Guarantor pursuant to the Security Documents, the definition of "Specified Swap Agreement" shall not create any guarantee by any Guarantor of (or grant of security interest by any Guarantor to support, if applicable) any Excluded Swap Obligation of such Guarantor.

"Guaranty" shall mean each Guaranty instrument executed by the Guarantors and delivered to the Agent to secure the Indebtedness.

"Guarantors" shall mean Richard J. Nichols and Orville B. Nichols, each in his individual capacity, and NB and such other Affiliates of the Borrower that as Mortgagor Affiliates are mortgagors, grantors or debtors signatory party to one or more Security Instruments, including present or future subsidiaries of Borrower signatory part(ies) to any of the Mortgages from time to time.

"hereby", "herein", "hereof", "hereunder" and similar such terms shall mean and refer to this Agreement as a whole and not merely to the specific section, paragraph or clause in which the respective word appears.

"HMTA" shall mean the Hazardous Materials Transportation Act, as amended, together with all regulations and rulings promulgated with respect thereto.

"HSWA" shall mean the Hazardous and Solid Waste Amendments of 1984, as amended, together with all regulations and rulings promulgated with respect thereto.

"Hedge Agreement" shall mean any interest rate Swap, cap or collar agreements, commodity price, interest rate and/or oil and gas future or option contracts, currency Swap agreements, currency future or option contracts and other similar ISDA Agreement or hedging/derivative agreements, and included without limitation the ISDA Agreement and related schedules and documents entered into with the Swap Counterparty and Borrower or Mortgagor Affiliate from time to time and as governed by the Intercreditor Agreement.   "Hedge Transaction" means a transaction pursuant to which Borrower hedges the price to be received by it for future production of its Hydrocarbons, including price Swaps under which Borrower agrees to pay a price for a specified amount of Hydrocarbons determined by reference to a recognized market on a specified future date and the contracting party agrees to pay Borrower a fixed price for the same or similar amount of Hydrocarbons.   "Prohibited Hedge Transactions" shall mean transactions pursuant to which the Borrower or one of the Mortgagor Affiliates is entering into or becomes obligated to enter into both physical and financial hedging transactions effective at

concurrent or overlapping periods of time on the same volumes of production or transactions that are speculative hedging in nature or purpose that are not tied to physical purchase/sale transactions of production or volumes of oil and/or gas.

"Hydrocarbons" shall have the meaning assigned to that term in the Mortgages.

"Indebtedness" shall mean and include any and all: (i) indebtedness, obligations and liabilities of the Borrower to the Agent and/or the Lenders incurred or which may be incurred or purportedly incurred hereafter pursuant to the terms of this Agreement, or any of the other Loan Documents, and any replacements, amendments, extensions, renewals, substitutions, amendments and increases in amount thereof, including such amounts as may be evidenced by the Revolver Notes and all lawful interest, late charges, service fees, commitment fees, fees in lieu of balances, letter of credit fees and other charges, and all reasonable costs and expenses incurred in connection with the preparation, filing and recording of the Loan Documents, including attorneys' fees and legal expenses; (ii) derivative products obligations, direct, contingent or otherwise, whether now existing or hereafter arising, of the Borrower to the Agent and/or the Lenders arising under or in connection with any Hedge Agreements or other Risk Management Agreements to which the Agent or the Swap Counterparty is a counter-party; (iii) reasonable costs and expenses paid or incurred by the Agent or the Lenders, including attorneys' fees, in enforcing or attempting to enforce collection of any Indebtedness and in enforcing or realizing upon or attempting to realize upon any collateral or security for any Indebtedness, including interest on all sums so expended by the Agent or the Lenders accruing from the date upon which such expenditures are made until paid, at an annual rate equal to the Default Rate; (iv) all sums expended by the Agent or the Lenders in curing any Event of Default or Default of the Borrower under the terms of this Agreement the other Loan Documents or any other writing evidencing or securing the payment of the Revolver Notes together with interest on all sums so expended by the Agent or the Lenders accruing from the date upon which such expenditures are made until paid, at an annual rate equal to the Default Rate; and (v) any overdraft, return items or other ACH obligations now or hereafter owing by Borrower to the Agent or the Lenders.

"Intercreditor Agreement" means any Intercreditor Agreement hereafter entered into, as amended, replaced, restated, supplemented or otherwise modified from time to time, together with exhibits, schedules, addenda and annexes attached thereto from time to time, between and among the Swap Counterparty, Borrower and Agent or any Lender, each in their respective roles thereunder, to govern the relationship of the parties thereto with respect to the priority of payment of obligations and Liens securing obligations regarding any ISDA Agreement referenced therein and the other Loan Documents.

"Interest Coverage Ratio" shall mean as of any quarterly calculation date, the quotient of (i) the Financial Covenant Entities' (herein defined) consolidated EBITDAX on an annualized quarterly basis, divided by (ii) Borrower's consolidated cash Interest Expense for the most recent twelve (12) month (rolling four (4) quarters) period.

"Interest Expense" means, for any period, Borrower's and Guarantors (excluding only NB and the individual Guarantors and collectively referred to herein as the "Financial Covenant Entities") consolidated total accrued or cash expense liability (including that attributable to

7

capital lease obligations) for such period due from time to time with respect to all outstanding indebtedness of Financial Covenant Entities (including commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Swap Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for the Financial Covenant Entities for such period in accordance with GAAP.

"ISDA Agreement" means any International Swap Dealers Association agreement, as amended, modified, replaced or supplemented from time to time, together with schedules, exhibits, confirmations, addenda and annexes attached thereto from time to time, entered into between or among any of the Financial Covenant Entities and a Swap Counterparty, to govern each Hedge Agreement with such Swap Counterparty.

"Laws" shall mean all statutes, laws, ordinances, regulations, orders, writs, injunctions, or decrees of the United States, any state or commonwealth, any municipality, any foreign country, any territory or possession, or any Tribunal.

"Letters of Credit" shall have the meaning assigned to that term in **Section 2.5**.

"Letter of Credit Exposure" means, at any date, the sum of (i) the aggregate face amount of all drafts that may then or thereafter be presented by beneficiaries under all Letters of Credit then outstanding, plus (b) the aggregate face amount of all drafts that the Agent, as letter of credit issuer, has previously accepted under Letters of Credit but has not paid plus (c) the aggregate amount of all unpaid reimbursement obligations in respect of previous drawings made under all Letters of Credit; provided, however, in no event shall the Letter of Credit Exposure exceed twenty percent (20%) of the *lesser* of the Collateral Borrowing Base or the Revolving Credit Commitment amount then in effect.

"Letter of Credit Issuer" shall mean CrossFirst Bank or any Affiliate or designee thereof and the respective successors and assigns thereof.

"Lien" shall mean any mortgage, pledge, security interest, assignment, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement or other similar form of public notice under the Laws of any jurisdiction).

"Loan Documents" shall mean this Agreement, the Revolver Notes, the Security Instruments (including without limitation, the Mortgage), the Guaranties, any Intercreditor Agreement and all other documents, instruments and certificates executed and delivered to the Agent by the Borrower or the Guarantors pursuant to the terms of this Agreement.

"Loans" shall mean the Revolving Credit Loans.

"Marketable Assets" shall mean (a) any readily-marketable Securities with maturities which exceed 365 days (i) issued by, or directly, unconditionally and fully guaranteed or insured by the United States federal government or (ii) issued by any agency of the United States federal government the obligations of which are fully backed by the full faith and credit of the United

States federal government, (b) any readily-marketable direct obligations issued by any other agency of the United States federal government, any state of the United States or any political subdivision of any such state or any public instrumentality thereof, in each case having a rating of at least "A-1" from S&P or at least "P-1" from Moody's, (c) any commercial paper rated at least "A-1" by S&P or "P-1" by Moody's and issued by any Person organized under the laws of any state of the United States, and (d) bonds issued by a Person organized under the laws of the United States, which bonds have a rating of at least BBB+ by S&P or at least Baa1 by Moody's.

"MCR" shall have the meaning assigned to that term in **Section 2.11**.

"Mortgage(s)" shall have the meaning assigned to that term in **Section 3.1** of this Agreement, including without limitation, any amendments thereto, restatements thereof and/or supplements thereof.

"Mortgaged Property" shall mean the property covered by the Mortgage defined in **Section 3.1** of this Agreement.

"Mortgagor Affiliates" shall mean Affiliates of the Borrower that are mortgagors or grantors signatory party to the Mortgages, including present or future subsidiaries of Borrower signatory part(ies) to the Mortgages.

"Non-Usage Fee" From the Closing Date to the date the Revolver Commitment expires or is otherwise terminated, the Borrower shall pay to the Bank quarterly in arrears in immediately available funds (U.S. Dollars) a fully earned and non-refundable Revolving Credit Commitment non-usage fee equal to twenty-five basis points (0.25%) per annum of the actual daily unused portion of the Revolver Commitment Amount (computed on the basis of a calendar year of 360 days but assessed for the actual number of days elapsed during each quarterly accrual period) calculated on the average amount thereof in excess of the outstanding principal balance of the Note plus the Letter of Credit Exposure during such calendar quarter.

"Notes" shall mean the Revolver Notes together with each and every extension, renewal, modification, replacement, substitution, rearrangement, consolidation and change in form thereof which may be from time to time and for any term or terms effected.

"OPA" shall mean the Oil Pollution Act of 1990, as amended, together with all regulations and rulings promulgated with respect thereto.

"Percentage Interests" shall mean the percentages for (a) Lenders designated on **Schedule I** annexed hereto, subject to (i) the recalculation of the denominator in the event of a Delinquent Lender insofar as voting rights and *pro rata* allocation of fees hereunder are concerned during the pendency of such Delinquent Lender's status, and (ii) the recalculation pursuant to **Section 10.4** and (b) Swap Counterparties, the estimated Early Termination Amount calculated by Swap Counterparty.

"Person" shall mean and include an individual, a partnership, a joint venture, a corporation, a trust, an unincorporated organization, and a government or any department, agency or political subdivision thereof.

9

"Polluting Substances" shall mean all pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes and shall include, without limitation, any flammable explosives, radioactive materials, oil, hazardous materials, hazardous or solid wastes, hazardous or toxic substances or related materials defined in CERCLA/SARA, RCRA/HSWA and in the HMTA; provided, in the event either CERCLA/SARA, RCRA/HSWA or HMTA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and, provided further, to the extent that the Laws of any State or other Tribunal establish a meaning for "hazardous substance, "hazardous waste," "hazardous material," "solid waste" or "toxic substance" which is broader than that specified in CERCLA/SARA, RCRA/HSWA, or HMTA, such broader meaning shall apply.

"Qualified ECP Guarantor" means, in respect of any Swap Obligation, Borrower and any Guarantor that is not an individual or a natural person and that has total assets exceeding $10,000,000 at the time the relevant Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under **Section 1a(18)(A)(v)(II)** of the Commodity Exchange Act.

"RCRA" shall mean the Resource Conservation and Recovery Act of 1976, as amended, together with all regulations and rulings promulgated with respect thereto.

"Required Lenders" shall mean the Lenders having (without regard to any sale by a Lender of participation in any Loan under **Section 10.3**) Percentage Interests not less than 66.67% of the aggregate Percentage Interests.

"Revolver Commitment Amount" shall mean the Lenders' aggregate Revolving Credit Commitment amounts set forth on Schedule I from time to time (initially stipulated to be $50,000,000.00).

"Revolving Credit Commitment" shall mean the Lender's several (not-joint) obligation to make the Revolving Credit Loans pursuant to **Section 2.1** of this Agreement.

"Revolving Credit Loans" shall have the meaning ascribed to it in **Section 2.1** of this Agreement.

"Revolver Notes" shall have the meaning ascribed to it in the Preamble of this Agreement, as more fully described and defined in **Section 2.2** of this Agreement.

"Risk Management Agreements" shall mean any commodity, interest rate or currency Swap, rate cap, rate floor, rate collar, forward agreement or other exchange, price or rate protection ISDA Agreement, Hedge Agreement or similar derivative agreements or any option with respect to any such derivative or hedging transaction.

"SARA" shall mean the Superfund Amendments and Re-authorization Act of 1987, as amended, together with all regulations and rulings promulgated with respect thereto.

10

"Security Instruments" shall mean the Mortgage, any security agreement and all other financing statements, assignments, pledges, documents or writings and any and all amendments and supplements thereto, granting, conveying, assigning, transferring or in any manner providing the Agent with a security interest in any property as security for the repayment of all or any part of the Indebtedness.

"Swap Counterparty" shall mean Cargill Incorporated or Macquarie Bank Limited (ABN 46-008-583-542), a bank incorporated under the laws of Australia, or any other hedge provider acceptable to the Agent and the Borrower, or their respective successors or permitted assigns, in each case, party to an Intercreditor Agreement.

"Swaps" shall mean, with respect to any Person, any financially settled transactions including, without limitation, any calls, puts, caps, collars, floors, interest rate swaps, currency swaps, commodity swaps and similar obligations obligating such Person to make payments, whether periodically or upon the happening of a contingency.  For the purposes of this Agreement, the amount of the obligations under any Swap shall be the amount determined by Swap Counterparty in respect thereof, based on the assumption that such Swap had terminated on the date of such calculation, and in making such determination, if any agreement relating to such Swap provides for the netting of amounts payable by and to such Person thereunder or if any such agreement provides for the simultaneous payment of amounts by and to such Person, then in each such case, the amount of such obligation shall be the net amount so determined.

"Tangible Net Worth" means, as of any date, equity or net worth of the Borrower, as determined on a GAAP basis, consistently applied, minus intangible assets of the Borrower, as determined on a GAAP basis, consistently applied, including (i) deferred charges, (ii) the amount of any write-up in the book value of any assets reflected on any balance sheet resulting from revaluation thereof or any write-up in excess of the cost of such assets acquired, and (iii) the aggregate of all amounts reflected on the assets side of any such balance sheet for franchises, licenses, permits, patents, patent applications, copyrights, trademarks, trade names, goodwill, experimental or organizational expenses and other like intangibles.

"Taxes" shall mean all taxes, assessments, fees, or other charges or levies from time to time or any time imposed by any Tribunal.

"Tribunal" shall mean any municipal, state, commonwealth, Federal, foreign, territorial or other sovereign, governmental entity, governmental department, court, commission, board, bureau, agency or instrumentality.

"TSCA" shall mean the Toxic Substances Control Act, as amended, together with all regulations and rulings promulgated with respect thereto.

1.1     Accounting Terms and Determinations.  Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Agent hereunder shall be prepared, in accordance with GAAP, applied on a basis consistent with the financial statements of the Borrower previously furnished to the Agent.

11

## ARTICLE II

## LOANS

2.1     Revolving Credit Loans.  The Lenders severally agree, upon the terms and subject to the conditions hereinafter set forth and Schedule I annexed hereto, for so long and to the extent no Default or Event of Default has occurred and remains uncured, to make revolving credit loans ("Revolving Credit Loans") to the Borrower, in accordance with each Lender's Percentage Interest on or after the Closing Date until the final maturity date (December 15, 2016, unless extended in writing), in such amounts as may from time to time be requested by Borrower for the purposes of refinancing the credit facilities of the Borrower with the Existing Lenders (approximately $45,000,000.00), funding its acquisitions, work-overs, development and enhancements, for general corporate purposes, including payroll and oil and gas capital expenditures and the issuance of standby letters of credit, so long as the sum of the aggregate principal amounts on all Revolving Credit Loans outstanding and unpaid at any time under the Revolver Notes plus the Letter of Credit Exposure do not exceed the lesser of (i) the Collateral Borrowing Base or (ii) the then applicable Revolver Commitment Amount (initially $50,000,000.00).

2.2     Revolver Notes.  On the Closing Date, the Borrower shall execute and deliver to the order of the respective Lenders the Borrower's promissory notes (the "Revolver Notes") for each Lender's Percentage Interest. The Revolver Notes shall bear interest on unpaid balances of principal from time to time outstanding and on any past due interest at a variable annual rate equal from day to day to the Applicable Prime Rate plus twenty five basis points (0.25%) but in no event less than a per annum contract rate of interest equal to 3.50%. Payments of interest only shall be payable on the Revolver Notes on the fifteenth (15th) day of each calendar month, commencing January 15, 2015, through and including December 15, 2016 (the final maturity date).  After maturity (whether by acceleration or otherwise) the Revolver Notes shall bear interest at the Default Rate, payable upon demand.  Interest shall be calculated on the basis of a year of 360 days but assessed for the actual number of days elapsed in each accrual period.  The Borrower may from time to time make prepayments of principal without premium or penalty. All payments and prepayments shall be made in lawful money of the United States of America.

2.3     Revolving Credit Advances.  Each Revolving Credit Loan requested by the Borrower from the Lenders shall (i) be requested telephonically or pursuant to a loan advance request to the Agent, the form of which is annexed hereto as Exhibit "A", no later than 11:00 o'clock A.M. (applicable current time in Tulsa, Oklahoma) on the date upon which the advance is to be made or letter of credit issued, as applicable, signed by any one of Richard J. Nichols (President), Orville B. Nichols (Secretary) or Phillip Burch (Chief Financial Officer); (ii) be in the amount of $100,000 or an integral multiple thereof (unless the amount then available to borrow is less than $100,000, in which event an advance may be made in the amount available); (iii) not cause the aggregate outstanding and unpaid principal amount of the Revolver Notes plus the Letter of Credit Exposure to exceed the lesser of (a) the Collateral Borrowing Base or (b) the then applicable Revolver Commitment amount; and (iv) be severally advanced by the Lenders on the applicable date, provided the request is timely made in accordance with this **Section 2.3** hereof and all other conditions of funding are met.  The Borrower will appoint such additional or replacement authorized individuals in writing delivered to the Agent as Borrower's duly

authorized agent and attorney in fact for all purposes hereunder in connection with Revolving Credit Loans, including (without limitation) the execution and delivery to the Agent for and on behalf of the Borrower of all Loan Advance Requests. In consideration of the Agent and the Lenders permitting telephonic requests for advances, the Borrower states that it fully understands the risk attendant thereto, agrees to accept all such risk and hold the Agent and/or the Lenders harmless from any loss which the Borrower may incur by reason of an advance being made in response to a telephonic request whether such is caused by mistake or negligence of the Agent and/or the Lenders or otherwise, unless it is judicially established that such loss was due to the gross negligence and wanton disregard of the Agent and/or the Lenders. All advances made by the Lenders shall, for mutual convenience, be deposited to the Borrower's general deposit account No. 201093107 with the Agent (the "General Account"), and the Agent and/or the Lenders shall have no responsibility to monitor the distribution of such advances in any other respect.

2.4     Advances/Payments/Voluntary Prepayments.  All advances made by the Lenders on the Revolver Notes and all payments or prepayments of principal and interest thereon made by the Borrower shall be recorded by the Agent in its records, and the aggregate unpaid principal amount so recorded shall be conclusive evidence of the principal amount owing and unpaid on the Revolver Notes, absent manifest error. The failure to so record shall not, however, limit or otherwise affect the obligations of the Borrower hereunder or under the Revolver Notes to repay the principal amount of each Revolving Credit Loan together with all interest accrued thereon. If additional lines or blanks shall be needed for the purpose of recording advances or payments on the schedule, one or more additional schedules may be annexed to the Revolver Notes and shall become a part thereof. Any payments or prepayments on the Revolver Notes received by the Agent after 2:00 o'clock P.M. (applicable current time in Tulsa, Oklahoma) shall be deemed to have been made on the next succeeding Business Day.

All payments and prepayments shall be made in lawful money of the United States of America in immediately available funds. Any payments or prepayments on the Revolver Notes received by the Agent after 2:00 o'clock p.m. (applicable current time in Tulsa, Oklahoma) shall be deemed to have been made on the next succeeding Business Day. Any voluntary prepayment shall be applied first to accrued but unpaid interest then to the next succeeding installment(s) of principal. All outstanding principal of and accrued interest on the Revolver Notes not previously paid hereunder shall be due and payable at final maturity on December 15, 2016, unless such maturity shall be extended by the Agent and the Lenders in writing or accelerated pursuant to the terms hereof.

2.5     Letters of Credit.  Upon the Borrower's application from time to time by use of the Agent's standard form Letter of Credit Application Agreement and subject to the terms and provisions therein and herein set forth, the Agent, as the letter of credit issuer, on behalf of the Lenders, agrees to issue standby letters of credit (the "Letters of Credit") on behalf of the Borrower under the Revolving Credit Commitment for specified amounts, provided that (i) no letters of credit will be issued on behalf of or on the account of Borrower with an expiry date later than December 15, 2016, unless such letters of credit (x) are fully secured and collateralized by cash or cash equivalents acceptable to the Agent and held thereby from and after the applicable maturity date (December 15, 2016, or alternatively, renewed in writing by the Agent) until expiration, termination or cancellation of such applicable letters of credit, or (y) continue to

13

be secured by the Security Instruments after such applicable maturity date and concerning which Security Instruments the Agent shall have no obligation to release or terminate until all such letters of credit expiring on or after the applicable maturity date have expired or otherwise canceled or terminated, and (ii) no letter of credit will be issued on behalf of or for the account of the Borrower if at the time of issuance the (a) the Letter of Credit Exposure exceeds or will exceed, sum of (a) the outstanding amount of all advances under the Revolving Credit Commitment plus (b) the unfunded amount of issued but unexpired Letters of Credit plus (c) the face amount of the requested Letter of Credit would exceed the lesser of (y) the then applicable Revolver Commitment Amount or (z) the Collateral Borrowing Base; provided however, in no event shall the aggregate Letter of Credit Exposure exceed twenty percent (20%) of the lesser of the Collateral Borrowing Base or the Revolver Commitment Amount then in effect. If any letter of credit is drawn upon at any time, each amount drawn, whether a full or partial draw thereon, shall be reflected by the Lenders as an advance on the Revolver Notes effective as of the date of the Agent's honoring the sight draft. If any letter of credit or letters of credit remain outstanding on November 30, 2016, the Agent, at its option, may make a line advance under the Revolving Credit Commitment in an amount equal to 103% of the aggregate face amount of such letter(s) of credit to purchase a certificate of deposit to be held by the Agent as cash security for the Indebtedness. In consideration of the Agent's agreement to issue standby letters of credit hereunder, the Borrower agrees to pay to the Agent for the allocable interest of the Lenders letter of credit issuance fees equal to two percent (2.00%) per annum on the face amount of each letter of credit but in no event less than $1,000.00, together with payment to the Agent of the Agent's standard letter of credit processing and amendment/renewal fees, which such fee shall be due and payable at the time of issuance of each applicable letter of credit.

2.6    Proceeds of Sale of Mortgaged Property. In the event any undivided interest in any of the Mortgaged Property is sold and causes a Collateral Borrowing Base Deficiency (as described in **Section 4.2** hereof), the sales proceeds of any such sale shall be applied initially to the outstanding principal balance of the Revolver Notes, then to accrued interest under the Revolver Notes; provided, however, no such sale shall occur except as permitted in **Section 6.16** or without the prior written consent of the Agent, not to be unreasonably withheld.

2.7    Loan Origination Fees. Borrower shall pay to the Agent for the allocable benefit of the Lenders in accordance with their respective Percentage Interests a non-refundable and fully earned loan facility origination fee equal to fifty basis points (0.50%) on the Revolver Commitment Amount (initially $50,000,000.00), subject only to the provisions of **Section 2.10** below. With each increase in the Revolver Commitment Amount an additional nonrefundable and fully earned loan amendment/origination fee equal to fifty basis points (0.50%) of such increase shall be concurrently paid to the Agent for the allocable benefit of the Lenders in accordance with their respective Percentage Interests in accordance with **Section 2.10** below.

2.8    Non-Usage Fee. From the Closing Date to the date the Revolving Credit Commitment expires or is otherwise terminated, the Borrowers shall pay to the Bank quarterly in arrears in immediately available funds (U.S. Dollars) a fully earned and non-refundable Non-Usage Fee. Such Revolver Commitment non-usage fee shall be payable quarterly, commencing with the calendar quarter ending December 31, 2014 (calculated from the Closing Date), and payable within ten (10) days following Borrowers' receipt of a written invoice therefor reasonably detailing the Bank's calculation thereof.

2.9     Agency/Arrangement Fees.  Borrower shall pay to the Agent for the sole benefit of the Agent such annual agency fees, initial syndication fees and initial arrangement fees as provided in a separate agency fee letter of even date herewith between the Agent and the Borrower.

2.10    Payment of Fees.  All fees payable under **Sections 2.5, 2.7, 2.8 and 2.9** above shall be paid on the scheduled due dates, in immediately available funds, US Dollars, to the Agent and shall be fully earned and non refundable under any circumstances.

2.11    MCR.  As of the first (1st) day of each calendar month, commencing on January 1, 2015, the amount available under the Revolving Credit Commitment shall be automatically reduced by such designated monthly commitment reduction amount per month (the "MCR").  To the extent the outstanding principal balance of the Revolver Notes is in excess of the adjusted amount of the Revolver Commitment Amount, the Borrower shall make a mandatory principal prepayment on the Revolver Notes in accordance with each Lender's Percentage Interest in such amount as is necessary to reduce the outstanding principal balance of the Revolver Notes to an amount less than or equal to the adjusted Revolving Credit Commitment, which such mandatory principal prepayment shall be made within five (5) days of the applicable MCR application.  The amount of the MCR shall be evaluated and redetermined by the Agent concurrent with each semi-annual Collateral Borrowing Base redetermination in accordance with the provisions of **Section 5.2.**  Initially, the MCR shall be $450,000.00 (based on the initial Revolver Commitment Amount of $50,000,000.00).

2.12    Termination of Hedge Agreement.  If and to the extent any Hedge Agreement or similar price protection or derivative product (interest rate or commodity risk management device, protection agreement or otherwise) pursuant to Hedge Transactions of the Borrower are used in calculation of the Collateral Borrowing Base (including any credit or cash flow value), such Hedge Agreement issued cannot be cancelled, liquidated or "unwound" by Borrower without the prior written consent of the Agent.

2.13    Late Fees. To the extent any payment due under any Revolver Note is not paid within ten (10) calendar days of the due date thereof, in addition to any interest or other fees and charges due hereunder or thereunder, the Borrower shall pay a late fee equal to five percent (5%) of the amount of the payment that was required to have been made, in addition to the payment of interest, up to the maximum amount of One Thousand Five Hundred Dollars ($1,500.00), which amount is stipulated by Borrower to be reasonable in order to compensate the Lenders for their additional costs incurred as a result of having to attend to such delinquency. This late fee should be charged only once, but promptly, as to each such delinquent or late payment.

2.14    Authorization for Direct Payments (ACH Debits).  To effectuate any payment due under the Revolver Notes or under any other Loan Document, each Borrower hereby authorizes the Agent to initiate debit entries to its operating account at the Agent and to debit the same to such operating account.  This authorization to initiate debit entries shall remain in full force and effect until the Agent has received written notification of its termination in such time and in such manner as to afford the Agent a reasonable opportunity to act on it.  Each Borrower represents that one or more of the Borrower are and will be the owner of all funds in such account.  Each Borrower acknowledges: (1) that such debit entries may cause an overdraft of such account

which may result in the Bank's refusal to honor items drawn on such account until adequate deposits are made to such account; (2) that the Bank is under no duty or obligation to initiate any debit entry for any purpose; and (3) that if a debit is not made because the above-referenced account does not have a sufficient available balance, or otherwise, the payment may be late or past due.

## ARTICLE III

## SECURITY

3.1     Collateral. The repayment of the Indebtedness shall be secured by the following (the items and types of collateral described herein and/or in the Security Instruments being collectively referred to as the "Collateral"):  a first mortgage lien in and to the Borrower's and the Mortgagor Affiliates' Mortgaged Property as more particularly described in the mortgage and deed of trust instruments dated as of even date herewith, and all mortgages and deed of trust instruments  encumbering all of the oil and gas leasehold working interests (each a "Mortgage", and collectively, the "Mortgages"), which such Mortgages cover and encumber producing oil, gas and other leasehold and mineral interests, including without limitation, those situated in the States of New Mexico, Oklahoma, Texas and Louisiana.   The Borrower shall execute such financing statements, letters in lieu of production forms, assignments, notices and other documents and instruments as shall be necessary or appropriate to perfect the security interests thus created.  The Borrower hereby acknowledges that all of the Collateral is granted to the Agent as security for the repayment of all of the Indebtedness. If the Revolver Notes is paid in full or satisfied, but any portion of the Indebtedness remains unsatisfied or the Revolving Credit Commitment remains in effect, the Agent has the right to retain its security interest in the Collateral until the remaining Indebtedness, including without limitation any amounts owing to Swap Counterparty under a Swap, is paid in full and the Revolving Credit Commitment is extinguished or has otherwise expired.

3.2     Guaranties.    To secure the prompt and full payment when due of the Indebtedness, the Borrower shall cause each of the Guarantors to execute and deliver to the Agent for the benefit of the Lenders at Closing his or its Guaranty under which the Guarantors shall jointly and severally, absolutely and unconditionally guaranty the prompt repayment of the Indebtedness.

3.3     Keepwell. Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time thereby to honor all of its obligations under Guaranty instrument in respect of a Swap Agreement and its Swap Obligation (provided, however, that each Qualified ECP Guarantor shall only be liable under this **Section 3.3** for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this **Section 3.3** or otherwise under this Guaranty voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this **Section 3.3** shall remain in full force and effect until the termination of all Swap Obligations under such Swap Agreement. Each Qualified ECP Guarantor intends that this **Section 2.17** constitute, and this **Section 3.3** shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Borrower or Guarantor for all purposes of **Section 1a(18)(A)(v)(II)** of the Commodity Exchange Act.

16

## ARTICLE IV

## COLLATERAL BORROWING BASE

4.1     Semi-annual Engineering Reports (Oil and Gas Properties).

(a)     The Borrower shall deliver to the Agent at the Borrower's expense by each April 1 and October 1, commencing April 1, 2015, such current data, reports and engineering information as is necessary or appropriate to determine the present value of Borrower's and any Mortgagor Affiliates' proven developed producing reserves of oil and gas and the value thereof consistent with general industry practices and the Agent's then existing policies and procedures, from (i) Pinnacle Energy Services or other reputable independent petroleum engineers acceptable to the Agent to compile for each April 1 information delivery date, and (ii) Borrower for each October 1 information delivery date, in form and substance satisfactory to the Agent, evaluating the proven developed producing oil and gas reserves attributable to the Borrower's and any Mortgagor Affiliates' aggregate interest in the Mortgaged Property (as defined in **subsection (b)** below), together with the expenses attributable thereto. The engineering data and information furnished to the Agent by or on behalf of the Borrower shall be accompanied by such other information as shall be requested by the Agent in order for the Lenders to make its determination of the Collateral Borrowing Base, and by a certificate of the Borrower certifying that the Borrower has good and defensible title to the Mortgaged Properties valued and that payments are being received from purchasers of production with respect to said interests.

At any time after thirty (30) days of the receipt of such information and in no event later than each May 1 and November 1 (commencing May 1, 2015) the Lenders shall (i) make a good faith determination of the present worth, using such pricing and discount factor as the Lenders deem reasonably appropriate pursuant to the Lenders' then applicable energy lending and engineering policies, procedures and pricing parameters, of the future net revenue estimated by the Agent to be received by the Borrower from not less than eighty percent (80%) of the oil and gas wells/properties so evaluated and attributable to Borrower or its Mortgagor Affiliates, multiplied by a percentage then determined by the Lenders to be appropriate on the basis of the Lenders' then applicable energy lending criteria, and (ii) report in writing to the Borrower such sum of the evaluation by the Agent of such evaluated oil and gas properties (the "Collateral Borrowing Base").

In addition to the scheduled semi-annual Collateral Borrowing Base redeterminations, (i) the Agent shall have the right to require additional Collateral Borrowing Base redeterminations at any time, including at the time of acquisitions or permitted sales of oil and gas leasehold producing properties included in the most recent Collateral Borrowing Base redetermination and (ii) the Borrower shall have the right to request, at Borrower's sole expense, one unscheduled Collateral Borrowing Base redetermination between each scheduled semi-annual Collateral Borrowing Base redetermination. The initial Collateral Borrowing Base is stipulated by the Agent, the

17

Lenders and the Borrower to be $50,000,000.00 as of the Closing Date. The good faith determinations of the Agent and the Lenders in such respects shall be conclusive.

(b)     The term "Mortgaged Property" shall refer only to such properties covered by the Mortgage (or a supplemental mortgage or deed of trust, duly executed, acknowledged and delivered by the Borrower to the Agent in form reasonably satisfactory to counsel for the Agent) and which properties are, at the time:

(i)     Particularly and adequately described under the Mortgage or other supplemental mortgage or deed of trust;

(ii)     Completed or developed (in the case of oil and gas leases) to the extent that value is being assigned to them by the Agent in connection with such evaluation and the Agent has determined that such properties are capable of producing oil or gas in commercial quantities; and

(iii)     Approved as to title to the reasonable satisfaction of the Agent.

(c)     The Borrower agrees that the Agent, for the benefit of the Lenders, shall be entitled at all times to have the "Mortgaged Property" covered and encumbered by the Mortgage or supplemental mortgages or deeds of trust constitute at least **eighty percent (80%)** of the aggregate value of the Borrower's and its Affiliates' oil and gas leasehold working interests considered for evaluation in the Collateral Borrowing Base determinations pursuant to **Section 4.1(a)** hereof, including (without limitation) encumbering, at the Agent's option, all acquired oil and gas, mining, mineral and/or leasehold properties and newly or additionally completed wells, all as a part of the Mortgaged Property determined in accordance with **subsections 4.1(a) and (b)(i), (ii) and (iii)**, respectively, above.

(d)     At the Agent's request, the Borrower shall furnish to the Agent as soon as practicable after the end of each calendar semi-annual period, and in any event within thirty (30) days after the calendar semi-annual period end, a production report and an expense report for such semi-annual period, certified by the Borrower's chief financial officer as being true, correct and complete, showing on a lease by lease basis (i) the gross proceeds from the sale of Hydrocarbons produced from the Mortgaged Property (including additional properties mortgaged subsequent to the Closing pursuant to **Section 4.2** above) owned by the Borrower, (ii) the severance, production ad valorem taxes and gathering taxes deducted from or paid from the Mortgaged Property proceeds, (iii) the Adjusted Gross Proceeds, (iv) the quantity of Hydrocarbons produced and sold from the Mortgaged Property and the number and identity of wells operated, drilled or abandoned, and (v) for each of the wells such operating and other expense and net income information pertaining to the Mortgaged Property owned by the Borrower as the Agent may request including, without limitation, a listing of material royalty liabilities and obligations on a lease by lease basis.

18

4.2   Collateral Borrowing Base Deficiency. Should the sum of the unpaid outstanding principal balance of the Revolver Notes at any time prior to maturity of the Revolver Notes *plus* the Letter of Credit Exposure plus the estimated Early Termination Amount of the Swaps be greater than the Collateral Borrowing Base in effect at such time, Agent may notify the Borrower in writing of the deficiency. Within fifteen (15) days from and after the date of any such deficiency notice Borrower shall notify Agent in writing of its election to:

(a)   Make a prepayment upon the Revolver Notes in an amount sufficient to reduce the aggregate unpaid principal amount outstanding on the Revolver Notes *plus* the Letter of Credit Exposure to an amount equal to or less than the amount of the Collateral Borrowing Base;

(b)   Make mandatory equal monthly principal payments on the Revolver Notes, due on the next five (5) successive monthly payment due dates on the Revolver Notes in an aggregate amount that will reduce the aggregate outstanding principal balance of the Revolver Notes *plus* the Letter of Credit Exposure to the projected Collateral Borrowing Base as of the next immediate semi-annual redetermination thereof in accordance with the provisions of **Sections 4.1** hereof; or

(c)   Execute and deliver to Agent one or more supplemental mortgages, deeds of trust, security agreements or pledges encumbering other properties or assets in form and substance satisfactory to Agent and its counsel as additional security for the Revolver Notes (and all other Indebtedness) to the extent such properties are reasonably acceptable to Agent and of such value, as determined by Agent, that the aggregate principal balance of the Revolver Notes *plus* the Letter of Credit Exposure will not exceed the Collateral Borrowing Base in conformance with Agent's then applicable energy lending and engineering/evaluation policies and procedures.

If Borrower shall have elected to make a prepayment on the Revolver Notes under **Section 4.2(a) or 4.2(b)** hereof, such prepayment, or the first installment of such prepayment, shall be due within fifteen (15) days after Borrower shall have notified Agent of such election, and the prepayment shall be applied as a mandatory principal prepayment of the Revolver Notes. If Borrower shall have elected to make installment payments to eliminate the deficiency under **Section 4.2(b)** hereof, then, until such deficiency is extinguished, any principal amounts outstanding on the Revolver Notes shall bear interest at the then applicable contract rate of interest *plus* two hundred additional basis points (2.0%). If Borrower shall elect to execute and deliver one or more supplemental oil and gas mortgages and deeds of trust to Agent under **Section 4.2(c)** hereof, Borrower shall provide Agent with descriptions of the additional properties to be mortgaged (together with any title due diligence data and information, current valuations and engineering reports applicable thereto which may be requested by Agent) at the time of Borrower's notice of such election and shall execute, acknowledge and deliver to Agent the appropriate supplemental mortgages and deeds of trust in recordable form within ten (10) days after such collateral documents shall be tendered to Borrower by Agent for execution, all in compliance with the provisions of clauses (i), (ii) and (iii) of **subsection 4.1(b)** above.

4.3   Asset Disposition Adjustment. In addition to the redeterminations of the Collateral Borrowing Base pursuant to **Section 4.1**, the Collateral Borrowing Base shall reduce

simultaneously with the completion by Borrower of any asset disposition by the Collateral Borrowing Base value of the Mortgaged Property which are the subject of such asset disposition (which shall be the Collateral Borrowing Base value assigned thereto by the Agent and the Lenders).

## ARTICLE V

## CONDITIONS PRECEDENT TO LOANS

5.1     Conditions Precedent to Revolving Credit Commitment.  The obligation of the Agent and the Lenders to establish the Revolving Credit Commitment and to make the initial Revolving Credit Loan under the new consolidated Revolving Credit Commitment, is subject to the satisfaction of all of the following conditions on or prior to the Closing Date (in addition to the other terms and conditions set forth herein):

(a)     No Default.  There shall exist no Event of Default or Default on the Closing Date.

(b)     Representations and Warranties.   The representations, warranties and covenants set forth in Articles VI and VII shall be true and correct on and as of the Closing Date, with the same effect as though made on and as of the Closing Date.

(c)     Certificates.   Each Borrower shall have delivered to the Agent a Certificate, dated as of the Closing Date, and signed by the President and the Secretary of the Borrower and the Mortgagor Affiliates certifying (i) to the matters covered by the conditions specified in **subsections (a) and (b)** of this **Section 5.1**, (ii) that the Borrower has performed and complied with all agreements and conditions required to be performed or complied with by them prior to or on the Closing Date, (iii) to the name and signature of the President and each other officer of each Borrower and each Mortgagor Affiliates authorized to execute and deliver the Loan Documents and any other documents, certificates or writings and to borrow under this Agreement, and (iv) to such other matters in connection with this Agreement which the Agent shall determine to be advisable.  The Agent and the Lenders may conclusively rely on such Certificate until it receives notice in writing to the contrary.

(d)     Proceedings.  On or before the Closing Date, all corporate proceedings of each Borrower and the Mortgagor Affiliates shall be taken in connection with the transactions contemplated by the Loan Documents and shall be satisfactory in form and substance to the Agent and its counsel; and the Agent shall have received certified copies, in form and substance satisfactory to the Agent and its counsel, of the Certificate of Incorporation and Bylaws or Limited Partnership Agreements, as applicable, of the Borrower and Mortgagor Affiliates and the resolutions of the directors or general partner of the Borrower and Mortgagor Affiliates, as applicable, as adopted, authorizing the execution and delivery of the Loan Documents, the borrowings under this Agreement, and the granting of the security interests in the Collateral pursuant to the Security Instruments, to secure the payment of the Indebtedness.

2643850.11

(e)      Security Instruments.  The Borrower shall have delivered and caused each Mortgagor Affiliate to deliver to the Agent the Security Instruments, appropriately executed by all parties, attested, sealed, witnessed and acknowledged to the satisfaction of the Agent and dated as of the Closing Date, together with such financing statements, and other documents as shall be necessary and appropriate to perfect the Agent's security interests in the Collateral covered by said Security Instruments.

(f)      Revolver Notes.  The Borrower shall have delivered each of the Revolver Notes to the order of the respective Lenders, appropriately executed.

(g)      Mortgages.   The Borrower shall have executed and delivered the Mortgages to the Agent in multiple recordable form counterparts as reasonably required by the Agent.

(h)      Guaranties.  Borrower shall have caused to be delivered to the Agent the Guaranties of each of the Guarantors in form, content and scope acceptable to the Agent and the Agent's legal counsel.

(i)      ISDA Agreement.  The Borrower shall have executed and delivered the ISDA Agreement to the Swap Counterparty in counterparts as reasonably required by the Swap Counterparty.

(j)      Intercreditor Agreement.   The Borrower shall have delivered the Intercreditor Agreement to the Agent in counterparts as reasonably required by the Agent and the Swap Counterparty.

(k)      Title.   The Borrower shall have provided the Agent with evidence satisfactory to the Agent and its legal counsel that the Borrower and/or Mortgagor Affiliates have valid, defensible title to the Collateral, including (without limitation) title reports, title opinions (division order or otherwise regarding the Mortgaged Property) and such evidence as shall be reasonably required by the Agent pertaining to all of the Mortgaged Property of the Borrower and/or such Mortgagor Affiliates, on behalf and for the Borrower and/or such Mortgagor Affiliates with all equitable interests therein fully vested in the Borrower and/or such Mortgagor Affiliates, as designated in each Mortgage instrument, for all purposes.

(l)      Life Insurance Collateral Assignments.  Each of the individual Guarantors and the Borrower shall cause to be delivered to the Agent life insurance collateral assignments by The Nichols Companies, Inc., f/k/a NOCO Investment Company, Inc., an affiliate of Borrower, on policies issued by reputable life insurance companies licensed in the State of Oklahoma on the lives of such individual Guarantors, each in the amount of $1,000,000.00, such collateral assignments in form, scope and substance acceptable to the Agent.

(m)      Fees.  Borrower shall have paid to the Agent the loan origination fees and any applicable agency fees due and payable under **Sections 2.7 and 2.9**, respectively, and, to the extent available and invoiced, the legal fees and expenses of the Agent's legal counsel.

21

(n)     Other Information.   The Agent shall have received such solvency certificate and such other information, documents and assurances as shall be reasonably requested by the Agent, including such other information with respect to the Mortgaged Property of the Borrower as shall be reasonably requested by the Agent.

(o)     Closing Opinions. Favorable closing opinions of corporate counsel and inside counsel to Borrower shall have been delivered to the Agent as to such matters as the Agent may reasonably request.

5.2     Conditions Precedent to All Revolving Credit Loans.  The Lenders shall not be obligated to make any Revolving Credit Loan as contemplated by **Section 2.3** hereof (i) if at such time any Event of Default shall have occurred or any Default shall have occurred and be continuing; (ii) if any of the representations, warranties and covenants contained in Articles VI and VII of this Agreement shall be false or untrue in any material respect on the date of such loan, as if made on such date, or (iii) Borrower and their entity Affiliates and Subsidiaries are not solvent on a consolidated basis.   Each request by the Borrower for an additional Revolving Credit Loan shall constitute a representation by the Borrower that there is not at the time of such request an Event of Default or a Default, and that all representations, warranties and covenants in Articles VI and VII of this Agreement are true and correct on and as of the date of each such request.

# ARTICLE VI

# COVENANTS

Each Borrower covenants and agrees with the Agent and the Lenders that from the date hereof and so long as this Agreement is in effect (by extension, amendment or otherwise) and until payment in full of all Indebtedness and the performance of all other obligations of the Borrower under this Agreement, unless the Agent shall otherwise consent in writing, which consent will not be unreasonably withheld:

6.1     Payment of Taxes and Claims. The Borrower will pay and discharge or cause to be paid and discharged all Taxes imposed upon the income or profits of the Borrower or upon the property, real, personal or mixed, or upon any part thereof, belonging to the Borrower before the same shall be in default, and all lawful claims for labor, rentals, materials and supplies which, if unpaid, might become a Lien upon its property or any part thereof; provided however, that the Borrower shall not be required to pay and discharge or cause to be paid or discharged any such Tax, assessment or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings, and adequate book reserves shall be established with respect thereto, and the Borrower shall pay such Tax, charge or claim before any property subject thereto shall become subject to execution.

6.2     Maintenance of Legal Existence.  The Borrower will do or cause to be done, and will cause each Mortgagor Affiliate, all things necessary to preserve and keep in full force and effect its corporate existence, rights and franchises and will continue to conduct and operate its business substantially as being conducted and operated presently.   The Borrower and each Mortgagor Affiliate will become and remain qualified to conduct business in each jurisdiction

22

where the nature of the business or ownership of property by the Borrower may require such qualification.

6.3   Preservation of Property.   The Borrower will at all times maintain, preserve and protect all franchises and trade names and keep all the remainder of its properties which are used or useful in the conduct of its businesses whether owned in fee or otherwise, or leased, in good repair and operating condition; from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto so that the business carried on in connection therewith may be properly conducted at all times; and comply with all material leases to which it is a party or under which it occupies property so as to prevent any material loss or forfeiture thereunder.

6.4   Insurance.   The Borrower will keep or cause to be kept adequately insured by financially sound and reputable insurers its motor vehicles, and all other property of a character usually insured by businesses engaged in the same or similar businesses.  Upon demand by the Agent any insurance policies covering the Collateral shall be endorsed to provide for payment of losses to the Agent as its interest may appear, and to provide that such policies may not be canceled, reduced or affected in any manner for any reason without thirty days prior notice to the Agent.  Such insurance shall be against fire, casualty and any other hazards normally insured against in amounts customary in the industry for similarly situated businesses and properties.  The Borrower shall at all times maintain adequate insurance against damage to persons or property, which insurance shall be by financially sound and reputable insurers and shall, without limitation, provide the following coverages: comprehensive general liability (including, without limitation, coverage, where applicable, damage caused by explosion, broad form property damage coverage, broad form coverage for contractually independent contractors), worker's compensation and automobile liability.

6.5   Compliance with Applicable Laws.   The Borrower will comply with the requirements of all applicable Laws and orders of any Tribunal and obtain any licenses, permits, franchises or other governmental authorizations necessary to the ownership of its properties or to the conduct of its business.

6.6   Financial Statements and Reports.

(a)   Quarterly Financial Statements.  As soon as practicable after the end of every fiscal quarter of the Borrower other than and except only for the fourth (4th) and final fiscal quarter of each fiscal year, and in any event within forty-five (45) days thereafter, the Borrower shall furnish to the Agent the following internally prepared consolidated financial statements:

(i)   A consolidated balance sheet of the Borrower at the end of such period, and

(ii)   A consolidated statement of income of the Borrower for such period with year-to-date earnings, setting forth in each case in comparative form the figures for the previous fiscal year, if applicable, all in reasonable detail.  The report of the preparer of the reports (the President or Chief Financial Officer of Borrower) shall be

23

accompanied by a compliance certificate in the form of **Exhibit B** annexed hereto from such preparer of the foregoing quarterly reports certifying that he/she has obtained no knowledge of any Event of Default or Default as defined herein, or, if any Event of Default or Default existed or exists, specifying the nature and period of existence thereof and that the Borrower is in compliance with all covenants, warranties, and representations set forth herein, including the financial covenants of **Sections 6.28 and 6.29** respectively, and calculations thereof in reasonable detail acceptable to the Agent.

(b)     Annual Financial Reports/Tax Returns of Borrower and Certain Guarantors.  As soon as available and in any event within thirty (30) days after the final filing deadline for same, the Borrower shall provide and shall cause (i) each individual Guarantor and NB to provide the Agent with full and complete copies of Borrower's and each such Guarantor's respective federal and state tax returns and (ii) each individual Guarantor and NB to provide to the Agent its or his signed annual financial statement within thirty (30) days after the close of each calendar year, commencing with calendar year ending December 31, 2014.  Within ninety (90) days of the end of the calendar year, the Borrower shall provide the Agent with its audited consolidated financial statements (including the information in **Section 6.6(a)** (i) and (ii), respectively, above for such entire applicable fiscal year period) from a firm of reputable independent certified public accountants in form and scope reasonably acceptable to the Agent.

(c)     Quarterly Hedge Reports.  As soon as available on a quarterly basis and no later than the tenth (10th) day of each succeeding calendar quarter (commencing as of January 10, 2015, for the calendar quarter ending December 31, 2014), a report, in form and substance satisfactory to the Agent, setting forth as of the last Business Day of such prior fiscal month end, a summary of its hedging positions under all Risk Management Agreements (including commodity price swap agreements, forward agreements or contracts of sale which provide for prepayment for deferred shipment or delivery of oil, gas or other commodities) of the Borrower, including the type, term effective date, termination date and notional principal amounts or volumes, the hedged price(s), interest rate(s) or exchange rate(s), as applicable, and any new credit support agreements relating thereto not previously disclosed to the Agent.

(d)     Quarterly Production Reports.  Financial Covenant Entities shall timely submit to Agent comprehensive (i) quarterly volume reports effective as of the close of each calendar month by the last Business Day of the next following calendar month, and (ii) quarterly net lease operating reports, all of which shall be in detail, form, content, substance and scope reasonably acceptable to Agent.

(e)     Annual Reserve Reports.  By April 1 of each year, beginning April 1, 2015, Financial Covenant Entities shall deliver to Agent an engineering reserve report concerning the Proven Reserves of Financial Covenant Entities, effective no earlier than the previous January 31, such reserve report to be in form, content, scope and substance acceptable to Agent,  and prepared and/or reviewed by a reputable third party engineering firm reasonably acceptable to the Agent, and shall include, without limitation, an audit of Financial Covenant Entities' production and expenses.

6.7     Environmental Covenants.  The Borrower will immediately notify the Agent of and provide the Agent with copies of any notifications of discharges or releases or threatened releases or discharges of a Polluting Substance on, upon, into or from the Collateral which are given or required to be given by or on behalf of the Borrower to any federal, state or local Tribunal if any of the foregoing may materially and adversely affect the Borrower or any part of the Collateral, and such copies of notifications shall be delivered to the Agent at the same time as they are delivered to the Tribunal.  The Borrower further agrees promptly to undertake and diligently pursue to completion any appropriate and legally required or authorized remedial containment and cleanup action in the event of any release or discharge or threatened release or discharge of a Polluting Substance on, upon, into or from the Collateral.  At all times while owning and operating the Collateral, the Borrower will maintain and retain complete and accurate records of all releases, discharges or other disposal of Polluting Substances on, onto, into or from the Collateral, including, without limitation, records of the quantity and type of any Polluting Substances disposed of on or off the Collateral.

6.8     Environmental Indemnities.  The Borrower hereby agrees to indemnify, defend and hold harmless the Agent, the Lenders, each Swap Counterparty and each of their officers, directors, employees, agents, consultants, attorneys, contractors and each of its affiliates, successors or assigns, or transferees from and against, and reimburse said Persons in full with respect to, any and all loss, liability, damage, fines, penalties, costs and expenses, of every kind and character, including reasonable attorneys' fees and court costs, known or unknown, fixed or contingent, occasioned by or associated with any claims, demands, causes of action, suits and/or enforcement actions, including any administrative or judicial proceedings, and any remedial, removal or response actions ever asserted, threatened, instituted or requested by any Persons, including any Tribunal, arising out of or related to:  (a) the breach of any representation or warranty of the Borrower contained in **Section 7.16** set forth herein; (b) the failure of the Borrower to perform any of its covenants contained in **Section 6.7** herein; (c) the ownership, construction, occupancy, operation, use of the Collateral prior to the earlier of the date on which (i) the Indebtedness and obligations secured hereby have been paid and performed in full and the Security Instruments have been released, or (ii) the Collateral has been sold by the Agent following the Agent's ownership of the Collateral by way of foreclosure of the Liens granted pursuant hereto, deed in lieu of such foreclosure or otherwise (the "Release Date"); provided, however, this indemnity shall not apply with respect to matters caused by or arising solely from the Agent's or the Lenders' activities during any period of time the Agent or the Lenders acquires ownership of the Collateral.

The indemnities contained in this **Section 6.8** apply, without limitation, to any violation on or before the Release Date of any Environmental Laws and any liability or obligation relating to the environmental conditions on, under or about the Collateral on or prior to the Release Date (including, without limitation:  (a) the presence on, upon or in the Collateral or release, discharge or threatened release on, upon or from the Collateral of any Polluting Substances generated, used, stored, treated, disposed of or otherwise released prior to the Release Date, and (b) any and all damage to real or personal property or natural resources and/or harm or injury including wrongful death, to persons alleged to have resulted from such release of any Polluting Substances regardless of whether the act, omission, event or circumstances constituted a violation of any Environmental Law at the time of its existence or occurrence).  The term "release" shall have the meaning specified in CERCLA/SARA and the terms "stored," "treated"

25

and "disposed" shall have the meanings specified in RCRA/HSWA; provided, however, any broader meanings of such terms provided by applicable laws of the State of Oklahoma shall apply.

The provisions of this **Section 6.8** shall be in addition to any other obligations and liabilities Borrower may have to the Agent and the Lenders at common law and shall survive the Release Date and shall continue thereafter in full force and effect.

The Agent and the Lenders agree that in the event that such claim, suit or enforcement action is asserted or threatened in writing or instituted against them or any of their officers, employers, agents or contractors or any such remedial, removal or response action is requested of them or any of their officers, employees, agents or contractors for which the Agent and/or the Lenders may desire indemnity or defense hereunder, the Agent shall give written notification thereof to the Borrower.

Notwithstanding anything to the contrary stated herein, the indemnities created by this **Section 6.8** shall only apply to losses, liabilities, damages, fines, penalties, costs and expenses actually incurred by the Agent or the Lenders as a result of claims, demands, actions, suits or proceedings brought by Persons who are not the beneficiaries of any such indemnity. The Agent shall act as the exclusive agent for all indemnified Persons under this **Section 6.8.** With respect to any claims or demands made by such indemnified Persons, the Agent shall notify the Borrower within thirty (30) days after the Agent's receipt of a writing advising the Agent of such claim or demand. Such notice shall identify (i) when such claim or demand was first made, (ii) the identity of the Person making it, (iii) the indemnified Person and (iv) the substance of such claim or demand. Failure by the Agent to so notify the Borrower within said thirty (30) day period shall reduce the amount of the Borrower's obligations and liabilities under this **Section 6.8** by an amount equal to any damages or losses suffered by the Borrower resulting from any prejudice caused the Borrower by such delay in notification from the Agent. Upon receipt of such notice, the Borrower shall have the exclusive right and obligation to contest, defend, negotiate or settle any such claim or demand through counsel of its own selection (but reasonably satisfactory to the Agent) and solely at Borrower's own cost, risk and expense; provided, that the Agent, at its own cost and expense shall have the right to participate in any such contest, defense, negotiations or settlement. The settlement of any claim or demand hereunder by the Borrower may be made only upon the prior approval of the Agent of the terms of the settlement, which approval shall not be unreasonably withheld.

6.9     Notice of Default.   Immediately upon any officer becoming aware of any condition or event which constitutes an Event of Default or Default or any default or event of default under any other loan, mortgage, financing or security agreement, the Borrower will give the Agent a written notice thereof specifying the nature and period of existence thereof and what actions, if any, the Borrower is taking and proposes to take with respect thereto.

6.10     Notice of Litigation.   Immediately upon becoming aware of the existence of any action, suit or proceeding at law or in equity before any Tribunal, an adverse outcome in which would (i) materially impair the ability of any of the Borrower to carry on its business substantially as now conducted, (ii) materially and adversely affect the condition (financial or otherwise) of the Borrower, or (iii) result in monetary damages in excess of $250,000, the

26

Borrower will give the Agent a written notice specifying the nature thereof and what actions, if any, the Borrower is taking and proposes to take with respect thereto.

6.11   Notice of Claimed Default.   Immediately upon becoming aware that the holder of any note or any evidence of indebtedness or other security of the Borrower has given notice or taken any action with respect to a claimed default or event of default thereunder, if the amount of the note or indebtedness exceeds $250,000 the Borrower will give the Agent a written notice specifying the notice given or action taken by such holder and the nature of the claimed default or event of default thereunder and what actions, if any, the Borrower is taking and proposes to take with respect thereto.

6.12   Notice of Change of Management.   Within five (5) days after any change in officers, directors or management of the Borrower or any officer of the Borrower holding the office of President, the Borrower shall give written notice thereof to the Agent, together with a description of the reasons for the change.

6.13   Requested Information.   With reasonable promptness, the Borrower will give the Agent such other data and information relating to the Borrower as from time to time may be reasonably requested by the Agent.

6.14   Inspection.   The Borrower will keep complete and accurate books and records with respect to the Collateral and its other properties, businesses and operations and will permit employees and representatives of the Agent to audit, inspect and examine the same and to make copies thereof and extracts therefrom during normal business hours.   All such records shall be at all times kept and maintained at the offices of the Borrower in Tulsa, Oklahoma.   Upon any Default or Event of Default, the Borrower will surrender all of such records relating to the Collateral to the Agent upon receipt of any request therefor from the Agent.

6.15   Maintenance of Employee Benefit Plans.   The Borrower will maintain each employee benefit plan as to which it may have any liability or responsibility in compliance with ERISA and all other Laws applicable thereto.

6.16   Disposition/Negative Pledge or Encumbrance of Collateral and Other Assets.   The Borrower will not, and will cause any Mortgagor Affiliate not to, sell or encumber any of the Collateral, and the Borrower and any Mortgagor Affiliate will not sell, lease, transfer, scrap or otherwise dispose of or mortgage, pledge, grant a security interest in or otherwise encumber any of the Borrower's other oil and gas mining or mineral properties, leasehold working or other rights, interests or assets, whether for replacement or otherwise, except in the ordinary course of Borrower's business.   In no event shall the Borrower cause or permit the voluntary or involuntary pledge, mortgage or other encumbrance, attachment or levy of or against any of its other properties or assets of whatsoever nature or type to any Person (financial institution or otherwise).

6.17   Limitation on Other Indebtedness.   The Borrower will not create, incur, assume, become or be liable in any manner in respect of, or suffer to exist, any indebtedness whether evidenced by a note, bond, debenture, agreement, letter of credit or similar or other obligation, or accept any deposits or advances of any kind, except: (i) trade payables and current indebtedness

27

(other than for borrowed money) incurred in, and deposits and advances accepted in, the ordinary course of business; (ii) indebtedness other than to the Lenders or the Agent hereunder not exceeding $3,000,000 in the aggregate during any calendar year of the Borrower (inclusive of assets sold in compliance with **Section 6.16** and the baskets permitted in **Sections 6.18 and 6.20**, respectively); (iii) contingent liabilities arising from the operations of the Borrower in the ordinary course of business such as plugging liabilities and similar operational matters customary for operators in the oil and gas industry; (iv) capital expenditures of any type in the aggregate during any calendar year not in excess of $5,000,000.00; and (v) the Indebtedness.

6.18    Limitation on Liens.  The Borrower will not create or suffer to exist any Lien upon any of its assets, whether real or personal property, except (i) purchase money security interests securing indebtedness incurred for the acquisition of assets not in excess of $3,000,000 (inclusive of the permitted baskets for transactions contemplated in **Sections 6.16, 6.17 and 6.20**, respectively) in the aggregate during any calendar year; (ii) operating liens in favor of an operator of oil and gas leasehold interests in accordance with normal and customary industry standards, and (iii) Liens in favor of the Agent securing the Indebtedness.

6.19    Contingent Liabilities; Advances.  Except for the items described on Exhibit "C" attached hereto, the Borrower will not either directly or indirectly otherwise, (i) guarantee, become surety for, discount, endorse, agree (contingently or otherwise) to purchase, repurchase or otherwise acquire or supply or advance funds in respect of, or otherwise become or be contingently liable upon the indebtedness, obligation or liability of any Person, (ii) guarantee the payment of any dividends or other distributions upon the stock of any corporation, (iii) discount or sell with recourse or for less than the face value thereof, any of its notes receivable, accounts receivable or chattel paper; (iv) loan, agree to loan, or advance money to any Person; or (v) enter into any agreement for the purchase or other acquisition of any goods, products, materials or supplies, or for the making of any shipments or for the payment of services, if in any such case payment therefor is to be made regardless of the non-delivery of such goods, products, materials or supplies or the non-furnishing of the transportation of services; provided, however that the foregoing shall not be applicable to (a) endorsement of negotiable instruments presented to or deposited with a bank for collection or deposit in the ordinary course of business or (b) payment of historical intercompany payables or receivables between or among Borrower, NB and/or other Affiliates thereof, including the Mortgagor Affiliates.

6.20    Merger, Consolidation, Acquisition, Etc.  Borrower will not merge or consolidate with or into any other Person; or permit any Person to merge into the Borrower; or acquire all or substantially all of the assets or properties or capital stock of any other Person; or adopt or effect any plan of reorganization, recapitalization, liquidation or dissolution; or acquire any properties or assets, other than in the ordinary course of business and not in excess of $300,000 in the aggregate during any calendar year (inclusive of the permitted baskets for transactions contemplated by **Sections 6.17 and 6.18**, respectively); provided, however, the Borrower may enter into letters of intent pertaining to merger, consolidation or acquisition subject to obtaining the Required Lenders' written consent thereto prior to consummation of the transactions contemplated by such letter(s) of intent.

6.21    Distributions/Dividends.  The Borrower will not declare, pay or become obligated to declare or pay any capital, cash or other distributions or dividends on any class of their

membership units or capital stock now or hereafter outstanding, make any distribution of capital, cash or property to holders of any shares of the Borrower or shares of such stock, or redeem, retire, purchase or otherwise acquire, directly or indirectly, any shares of any class of their capital stock now or hereafter outstanding, subject, however, to payment of customary and historical inter-company payables and receivables.

6.22   Change of Fiscal Year.   The Borrower will not change its fiscal year from its present fiscal year (fiscal year ending December 31).

6.23   Change of Business.   The Borrower will not engage in any business activity substantially different from or unrelated to present business activities and operations.

6.24   Certificate of Incorporation; Bylaws and Assumed Names.   The Borrower will not amend, alter, modify or restate its Certificate of Incorporation or Bylaws in any way which would: (i) change the name or adopt a trade name for the Borrower; or (ii) in any manner adversely affect the rights of the Borrower's obligations or covenants to the Agent and the Lenders hereunder.

6.25   Transactions with Affiliates.   The Borrower will not enter into any transaction, including (without limitation) the purchase, sale or exchange of property or the rendering or furnishing of any service with any Affiliate of the Borrower, except transactions in the ordinary course of the businesses of the Borrower and upon fair and reasonable terms no less favorable than the Borrower would obtain in a transaction for the same purpose with a Person that is not an Affiliate of the Borrower.

6.26   Other Agreements.   The Borrower will not enter into or permit to exist any agreement which: (i) would cause an Event of Default or a Default hereunder; or (ii) contains any provision which would be violated or breached by the performance of the Borrower's obligations hereunder or under any of the other Loan Documents.

6.27   Payment of Indebtedness.   The Borrower hereby agrees to pay, when due and owing, all Indebtedness, whether or not evidenced by the Revolver Notes.

6.28   Minimum Interest Coverage Ratio.   Borrower shall not permit its Interest Coverage Ratio, determined as of the end of each fiscal quarter, to be less than 4.00 to 1.0, commencing as of the fiscal quarter ending December 31, 2014.

6.29   Maximum Funded Debt to EBITDAX Ratio.   Borrower shall not permit its Funded Debt to EBITDAX Ratio determined as of the end of each fiscal quarter, on an annualized basis, to exceed 4.0 to 1.0, commencing with the quarter ending December 31, 2014:

6.30   Minimum Required Hedging.   Borrower and its subsidiaries shall hedge not less than 50% of its monthly crude production for a twelve (12) month rolling forward period.  In no event shall Borrower hedge more than eighty percent (80%) of Borrower's monthly production for a specified period of time, all as determined by Agent in its good faith discretion, pursuant to forward derivative contracts acceptable to the Agent.  Borrower shall not enter into any financial and physical hedge transactions affecting or covering the same volume of production for

29

concurrent or overlapping periods of time. The applicable counterparty to any ISDA Agreement shall be reasonably acceptable to Agent and approved thereby in writing.

6.31   Collateral Borrowing Base Credit for Hedge Agreements. To the extent Borrower is given any credit or cash flow value in the Collateral Borrowing Base determinations for Hedge Agreements or other derivative products in effect by Agent or the Swap Counterparty from time to time (semi-annual engineering redeterminations or otherwise), Borrower shall not liquidate, cancel, terminate or otherwise "unwind" any hedges, rate risk management agreement or other Hedge Agreement without the prior verbal consent of Agent (to be confirmed in writing within one (1) Business Day thereafter), which such consent will not be unreasonably withheld or delayed.

6.32   Hedging. Upon Borrower's institution of the required and permitted hedging required or permitted by **Section 6.30**, such devices shall include a "price floor" or comparable financial hedge or risk management agreement with the Swap Counterparty acceptable to Agent and the Swap Counterparty in all respects (including, without limitation, price and term), with a maximum of 80% of Borrower's aggregate existing oil and gas monthly production (as forecast in Agent's most recent semiannual engineering valuation pursuant to Article V hereof) for not more than three (3) years, and otherwise in form, content and substance acceptable to Agent and the Swap Counterparty. Agent and the Required Lenders (excluding Swap Counterparties), at their good faith and reasonable discretion, may require Borrower to hedge a specified percentage of Borrower's monthly production for a specified period of time, all as determined by the Agent in its good faith discretion. Except as approved in advance by Agent, Borrower shall not enter into any Prohibited Hedge Transaction, including, without limitation, any financial and physical hedge transactions affecting or covering the same volume of production for concurrent or overlapping periods of time. The applicable counterparty to any ISDA Agreement shall be the Swap Counterparty or otherwise reasonably acceptable to the Agent and approved thereby in writing.

6.33   Investments. Neither Borrower nor any of the Mortgagor Affiliates will make or permit to be made any loan or advance to any Person, or purchase or otherwise acquire, any capital stock, assets, obligations, or other securities of, make any capital contribution to, or otherwise invest in or acquire any interest in any Person, or participate as a partner or joint venturer with any other Person in excess of $500,000.00 in the aggregate (together with the acquisitions permitted by **Section 6.34**), except: (1) direct obligations of the United States or any agency thereof with maturities of one year or less from the date of creation thereof; (2) commercial paper of a domestic issuer rated at least "A1" by Standard & Poor's Ratings Group of "P1" by Moody's Investors Service, Inc. and maturing within 180 days of the date of creation thereof; (3) overnight euro deposits (including euro dollar sweep accounts) and certificates of deposit with maturities of one year or less from the date of creation thereof issued by any Lenders or any other commercial bank organized under the laws of the United States or any state thereof, with a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time by Standard & Poor's Corporation or Moody's Investors Service, Inc., respectively, reasonably acceptable to the Lenders; and (4) stock, obligations, or securities received in settlement of debts (created in the ordinary course of business) owing to the Borrower or a Mortgagor Affiliate.

6.34    Agreement to Grant Additional Security/Collateral.

(a)    Promptly, and in any event not later than ten (10) days prior to the acquisition of assets of the type that would have constituted Collateral at the date hereof and investments of the type that would have constituted Collateral on the date hereof (other than and excluding only assets with a fair market value of less than $200,000), including the capital stock of any direct or indirect Subsidiary of Borrower or any of the Mortgagor Affiliates, Borrower shall notify the Agent of the proposed acquisition of such assets or investments and, to the extent not already Collateral in which the Collateral Agent for the benefit of the Lenders and the Swap Counterparty has a perfected security interest pursuant to the Security Instruments, such assets and investments will become additional Collateral hereunder (the "Additional Collateral"), and the Borrower will, and will cause or permit any of the Mortgagor Affiliates to take all necessary action, including the filing of appropriate financing statements under the provisions of the UCC, applicable foreign, domestic or local laws, rules or regulations in each of the offices where such filing is necessary or appropriate to grant the Agent a perfected Lien in such Additional Collateral (or comparable interest under foreign law in the case of foreign Collateral) pursuant to and to the full extent required by the Security Instruments and this Agreement.

(b)    Promptly, and in any event no later within ten (10) days after the date on which an entity becomes a direct or indirect Subsidiary of the Borrower or any Mortgagor Affiliate (or if acceptable to the Required Lenders in the exercise of its sole discretion, not later than thirty (30) days after a request with respect thereto), Borrower shall cause each of the direct and indirect Subsidiaries thereof or of the Mortgagor Affiliates (the "Subsidiary Guarantor") to become party to, or to execute and deliver, a guaranty substantially in form and substance satisfactory to the Agent and its legal counsel (as hereafter amended, supplemented or otherwise modified from time to time in accordance with its terms, and whether one or more, collectively the "Subsidiary Guaranty"), guarantying to the Lenders the prompt payment, when and as due, of all Indebtedness of the Borrower and the Guarantors under the Loan Documents, including all Indebtedness and obligations under any Hedge Agreements or other hedging agreements.

(c)    Promptly, and in any event no later than the date on which an entity becomes a direct or indirect Subsidiary of Borrower or any of the Mortgagor Affiliates (or if acceptable to the Required Lenders in the exercise of their sole discretion, not later than thirty (30) days after a request with respect thereto), Borrower shall cause each Subsidiary Guarantor created or established after the date hereof to grant to the Collateral Agent for the benefit of the Lenders and the Swap Counterparty a first priority Lien (subject to Permitted Liens) on all property (tangible and intangible) of such Subsidiary Guarantor, including, without limitation, all of the outstanding capital stock of any of its Subsidiaries and 65% (or up to 100% if not prohibited by applicable law or resulting in materially adverse tax consequences as determined in the reasonable discretion of the Required Lenders upon consultation with the Borrower) of the outstanding stock of any of its foreign Subsidiaries and the Credit Parties and Subsidiary shall grant such Lien on

31

the outstanding capital stock of any foreign Subsidiary owned by any of the Credit Parties or any domestic Subsidiary (in the same percentages as set forth above) in each case, upon terms similar to those set forth in the Security Instruments and otherwise satisfactory in form and substance to the Agent and the Required Lenders. The Borrower shall cause each Subsidiary Guarantor, at its own expense, to become a party to a Security Agreement and any other Security Instruments (to the extent applicable to such Subsidiary Guarantor and its assets) and to execute, acknowledge and deliver or cause the execution, acknowledgment and delivery of, and thereafter register, file or record in any appropriate governmental office, any document or instrument reasonably deemed by the Agent and the Required Lenders to be necessary or desirable for the creation and perfection of the foregoing Liens (including UCC, tax and judgment Lien searches, legal opinions, title insurance, consents, corporate/partnership/limited liability company documents and any additional or substitute security agreements or mortgages or deeds of trust). The Borrower will cause each such party to take all reasonable actions requested by the Agent or the Required Lenders (including, without limitation, the filing of UCC-1's or initial financing statements in lieu of continuation statements as may be deemed appropriate or necessary under revised Article 9 of the Uniform Commercial Code now or hereafter in effect in any of the applicable jurisdictions pertaining to the Collateral, the Borrower or any of the Subsidiary Guarantors) in connection with the granting of such security interests.

(d) Borrower shall promptly, and in any event not later than twenty (20) days after a request with respect thereto, (i) deliver to the Agent the original of all instruments, documents and chattel paper, and all other Collateral of which the Agent or the Required Lenders determine the Agent should have physical possession in order to perfect and protect its security interest therein, duly pledged, endorsed or assigned to the Agent without restriction; (ii) obtain landlord waivers, in form and substance satisfactory to the Agent and the Required Lenders, with respect to any Inventory or other Collateral located at a location that is not owned by one of the Borrower or the Mortgagor Affiliates or a Subsidiary; (iii) deliver to the Agent warehouse receipts covering any portion of the Inventory or other Collateral located in warehouses and (i) for which warehouse receipts are issued; (iv) when an Event of Default exists, transfer inventory to locations designated by the Agent; (v) if any Collateral (except immaterial amounts if the specific exclusion thereof from the terms of this clause shall have been consented to in writing by the Agent) is at any time in the possession or control of any warehousemen, bailee or Borrower's or Mortgagor Affiliates' agents or processors, notify the Agent thereof and notify such person of the Collateral Agent's security interest in such Collateral and obtain a landlord waiver or bailee letter, in form and reasonably satisfactory to the Agent, from such person and instruct such person to hold all such Collateral for the Agent's account subject to the Collateral Agent's instructions; (vi) if at any time any Inventory or other Collateral is located on any real property owned by Borrower or one of the Mortgagor Affiliates which is subject to a Lien (other than in favor of the Agent), obtain a mortgagee waiver, in form and substance satisfactory to the Agent, from the holder of each Lien on such real property; and (vii) take all such other actions and obtain all such

32

other agreements as the Agent may reasonably deem necessary or desirable in respect of any Collateral.

(e)    The security interests required to be granted pursuant to this **Section 6.34** shall be granted pursuant to the Security Instruments or, in the Agent's discretion, such other or additional security documentation (which shall be substantially similar to the Security Instruments already executed and delivered by the Borrower or any Mortgagor Affiliate) as is satisfactory in form and substance to the Agent (collectively the "Additional Security Instruments") and shall constitute valid and enforceable perfected security interests prior to the rights of all third Persons and subject to no other Liens except Permitted Liens permitted under **Section 6.18**.    The Additional Security Instruments and other instruments related thereto shall be duly recorded or filed in such manner and in such places and at such times as are required by Law to establish, perfect, preserve and protect the Liens, in favor of the Agent, granted pursuant to the Additional Security Instruments, and all Taxes, fees and other charges payable in connection therewith shall be paid in full by the Borrower.  At the time of the execution and delivery of Additional Security Instruments, the Borrower shall deliver or cause to be delivered to the Agent such agreements, opinions of counsel, and other related documents (including, without limitation, certified copies of certificates of incorporation/partnership/limited liability company, as the case may be, by-laws/partnership agreement/operating agreement, as the case may be, corporate, partnership or other resolutions, incumbency certificates, good standing certificates, Lien searches, and loss-payee endorsements) as may be reasonably requested by the Agent or the Required Lenders to assure themselves that this **Section 6.34** has been complied with.

6.35    Use of Loan Proceeds.    Neither Borrower nor any of the Mortgagor Affiliates shall use any proceeds of any Revolving Credit Loan advance request or Letter of Credit issuance request under the Revolving Credit Commitment for any purpose other than those expressly permitted and contemplated by this Agreement, and in no event shall any loan proceeds be used for any purpose that would create or cause a breach, violation or default or event of default hereunder or under any of the other Loan Documents (including the Security Instruments) or violation of Regulations G, U or X or any other regulation of the Board of Governors of the Federal Reserve System or to violate **Section 7** of the Securities Exchange Act of 1934 or any rule or regulation thereunder, in each case as now in effect or as the same may hereinafter be in effect.

6.36    Prohibited Uses.    Borrower hereby agrees that it will not, directly or indirectly, lend, contribute or otherwise make available any Revolving Loan advance proceeds to any subsidiary, affiliate, joint venture partner or other person or entity: (i) to fund any activities or business of or with any person or entity, or in any country or territory, that, at the time of such funding, is the subject of any sanctions administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), or in any other manner that would result in a violation of OFAC sanctions by any person or entity, including any person or entity participating in any capacity in the Revolver Loan; or (ii) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money or anything else of value, to any person in violation of any applicable laws, rules, or regulations relating to bribery or corruption.

33

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

To induce the Agent and the Lenders to enter into this Agreement and to make Loans to each Borrower under the provisions hereof, and in consideration thereof, the Borrower represents, warrants and covenants as follows:

7.1     Organization and Qualification.  The Borrower and each Mortgagor Affiliate  is duly organized, validly existing, and in good standing as a corporation under the Laws of Oklahoma, and is duly licensed and in good standing as a foreign corporation in each jurisdiction in which the nature of the business transacted or the property owned is such as to require licensing or qualification as such.

7.2     Litigation.  Except for the actions described on Exhibit "D" attached hereto, there is no action, suit, investigation or proceeding threatened or pending before any Tribunal against or affecting the Borrower or any properties or rights of the Borrower which, if adversely determined, would result in a liability of greater than $250,000 or would otherwise result in any material adverse change in the business or condition, financial or otherwise, of the Borrower. The Borrower is not in default with respect to any judgment, order, writ, injunction, decree, rule or regulation of any Tribunal.

7.3     Financial Statements.   The Borrower's most recent consolidated unaudited financial statements which have been furnished to the Agent have been prepared in conformity with GAAP or tax-basis accounting, show all material liabilities, direct and contingent, and fairly present the consolidated financial condition of the Borrower as of the date of such statements and the results of their operations for the period then ended, and since the date of such statements there has been no material adverse change in the business, financial condition or operations of the Borrower.

7.4     Conflicting Agreements and Other Matters.  The Borrower is not in default in the performance of any obligation, covenant, or condition in any material agreement to which it is a party or by which it is bound.  The Borrower is not a party to any contract or agreement or subject to any other restriction which materially and adversely affects its business, property or assets, or financial condition.  The Borrower is not a party to or otherwise subject to any contract or agreement which restricts or otherwise affects the right or ability of the Borrower to execute the Loan Documents or the performance of any of their respective terms.  Neither the execution nor delivery of any of the Loan Documents, nor fulfillment of nor compliance with their respective terms and provisions will conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in any violation of, or result in the creation of any Lien (except those created by the Loan Documents) upon any of the properties or assets of the Borrower pursuant to, or require any consent, approval or other action by or any notice to or filing with any Tribunal (other than routine filings after the Closing Date with the Securities and Exchange Commission, any securities exchange and/or state blue sky authorities) pursuant to the Certificate of Incorporation or Bylaws of the Borrower, any award of any arbitrator, or any agreement, instrument or Law to which the Borrower is subject.

34

7.5     Authorization.  The directors of the Borrower have duly authorized the execution and delivery of each of the Loan Documents and the performance of their respective terms.  No other consent of any other Person, except for the Agent, is required as a prerequisite to the validity and enforceability of the Loan Documents.

7.6     Purposes.  The Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System) and no part of the proceeds of any borrowing hereunder will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.  If requested by the Agent, the Borrower will furnish to the Agent a statement in conformity with the requirements of Federal Reserve Form U-1, referred to in Regulation U, to the foregoing effect.  Neither the Borrower nor any agent acting on behalf thereof has taken or will take any action which might cause this Agreement or the Revolver Notes to violate any regulation of the Board of Governors of the Federal Reserve System (including Regulations G, T, U and X) or to violate any securities laws, state or federal, in each case as in effect now or as the same may hereafter be in effect.

7.7     Compliance with Applicable Laws.  The Borrower is in compliance with all Laws, ordinances, rules, regulations and other legal requirements applicable to it and the business conducted by it, the violation of which could or would have a material adverse effect on its business or condition, financial or otherwise.  Neither the ownership of any shares of the Borrower, nor any continued role of any Person in the management or other affairs of the Borrower (i) will result or could result in the Borrower's noncompliance with any Laws, ordinances, rules, regulations and other legal requirements applicable to the Borrower, or (ii) could or would have a material adverse effect on the business or condition, financial or otherwise, of the Borrower.

7.8     Possession of Franchises, Licenses.  The Borrower possesses all franchises, certificates, licenses, permits and other authorizations from governmental political subdivisions or regulatory authorities, free from burdensome restrictions, that are necessary in any material respect for the ownership, maintenance and operation of its properties and assets, and the Borrower is not in violation of any thereof in any material respect.

7.9     Leases.  The Borrower enjoys peaceful and undisturbed possession of all leases necessary in any material respect for the operation of its respective properties and assets, none of which contains any unusual or burdensome provisions which might materially affect or impair the operation of such properties and assets.  All such leases are valid and subsisting and are in full force and effect.

7.10    Taxes.  The Borrower has filed all Federal, state and other income tax returns which are required to be filed and has paid all Taxes, as shown on said returns, and all Taxes due or payable without returns and all assessments received to the extent that such Taxes or assessments have become due.  All Tax liabilities of the Borrower are adequately provided for on the books of the Borrower, including interest and penalties.  No income tax liability of a material nature has been asserted by taxing authorities for Taxes in excess of those already paid.

7.11 <u>Disclosure</u>. To the best of Borrower's knowledge following a due diligent inquiry and investigation, neither this Agreement nor any other Loan Document or writing furnished to the Agent by or on behalf of the Borrower in connection herewith contains any untrue statement of a material fact nor do such Loan Documents and writings, taken as a whole, omit to state a material fact necessary in order to make the statements contained herein and therein not misleading. There is no fact known to the Borrower and not reflected in the financial statements or exhibits hereto provided to the Agent which materially adversely affects or in the future may materially adversely affect the business, property, or assets, or financial condition of the Borrower which has not been set forth in this Agreement, in the Loan Documents or in other documents furnished to the Agent by or on behalf of the Borrower prior to the date hereof in connection with the transactions contemplated hereby.

7.12 <u>Investment Company Act Representation</u>. The Borrower is not an "investment company" or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.

7.13 <u>ERISA</u>. Since the effective date of Title IV of ERISA, no Reportable Event has occurred with respect to any Plan. For the purposes of this section the term "Reportable Event" shall mean an event described in **Section 4043(b)** of ERISA. For the purposes hereof the term "Plan" shall mean any plan subject to Title IV of ERISA and maintained for employees of the Borrower, or of any member of a controlled group of corporations, as the term "controlled group of corporations" is defined in **Section 1563** of the Internal Revenue Code of 1986, as amended (the "Code"), of which the Borrower is a part. Each Plan established or maintained by the Borrower is in material compliance with the applicable provisions of ERISA, and the Borrower has filed all reports required by ERISA and the Code to be filed with respect to each Plan. The Borrower has met all requirements with respect to funding Plans imposed by ERISA or the Code. Since the effective date of Title IV of ERISA there have not been any nor are there now existing any events or conditions that would permit any Plan to be terminated under circumstances which would cause the lien provided under **Section 4068** of ERISA to attach to the assets of the Borrower. The value of each Plan's benefits guaranteed under Title IV of ERISA on the date hereof does not exceed the value of such Plan's assets allocable to such benefits on the date hereof.

7.14 <u>Fiscal Year</u>. The fiscal year of the Borrower ends as of December 31 of each year.

7.15 <u>Title to Properties; Authority</u>. The Borrower has full power, authority and legal right to own and operate the properties which it now owns and operates, and to carry on the lines of business in which it is now engaged, and together with the Mortgagor Affiliates has good and marketable title to the Mortgaged Property in its or their corporate or other legal entity capacity subject to no Lien of any kind except Liens permitted by this Agreement. The Borrower together with the Mortgagor Affiliates owns a working interest and net revenue interest in the oil and gas leasehold estate for the Mortgaged Property of not less than the amounts set forth on a well by well basis as represented and submitted to the Agent in writing. The Borrower has full power, authority and legal right to execute and deliver and to perform and observe the provisions of this Agreement and the other Loan Documents. The Borrower further represents to the Agent and the Lenders that any and all after acquired interest in any of the Mortgaged Property being

concurrently or subsequently assigned of record to the Borrower is and shall be deemed encumbered by the Mortgage in all respects.

7.16   Environmental Representations.  To the best of the Borrower's knowledge and belief, upon reasonable and good faith inquiry exercised with due diligence and in accordance with normal industry standards:

(a)     The Borrower is not subject to any material liability or obligation relating to (i) the environmental conditions on, under or about the Collateral, including, without limitation, the soil and ground water conditions at the location of any of the Borrower's properties, or (ii) the use, management, handling, transport, treatment, generation, storage, disposal, release or discharge of any Polluting Substance;

(b)     The Borrower has not obtained and is not required to obtain or make application for any permits, licenses or similar authorizations to construct, occupy, operate or use any buildings, improvements, facilities, fixtures and equipment forming a part of the Collateral by reason of any Environmental Laws;

(c)     The Borrower has taken all steps necessary to determine and has determined that no Polluting Substances have been disposed of or otherwise released on, onto, into, or from the Collateral (the term "release" shall have the meanings specified in CERCLA/SARA, and the term "disposal" or "disposed" shall have the meanings specified in RCRA/HSWA; provided, in the event either CERCLA/SARA or RCRA/HSWA is amended so as to broaden the meaning of any term defined thereby, such broader meaning shall apply subsequent to the effective date of such amendment and provided further, to the extent that the laws of any State or Tribunal establish a meaning for "release," "disposal" or "disposed" which is broader than that specified in CERCLA/SARA, RCRA/HSWA or other Environmental Laws, such broader meaning shall apply);

(d)     There are no material amounts of PCB's or asbestos-containing materials, whether in the nature of thermal insulation products such as pipe boiler or breech coverings, wraps or blankets or sprayed-on or troweled-on products in, on or upon the Collateral; and

(e)     There is no urea formaldehyde foam insulation ("UFFI") in, on or upon the Collateral.

7.17   Oil and Gas Contracts.  All contracts, agreements and leases related to any of the oil and gas mining, mineral or leasehold properties and all contracts, agreements, instruments and leases to which the Borrower is a party, to the best of Borrower's knowledge following a due diligent inquiry thereby, are valid and effective in accordance with their respective terms, and all material agreements included in the oil and gas mining, mineral or leasehold properties in the nature of oil and/or gas purchase agreements, and oil and/or gas sale agreements are in full force and effect and, to the best of Borrower's knowledge following a due diligent inquiry thereby, are valid and legally binding obligations of the parties thereto and all payments due thereunder have been made, except for those suspended for reasonable cause in the ordinary course of business;

37

and, there is not under any such contract, agreement or lease any existing default known or that should be known to the Borrower by any party thereto or any event which, with notice or lapse of time, or both, would constitute such default, other than minor defaults which, in the aggregate, would result in losses or damages of more than $100,000 to the Borrower.

7.18    Natural Gas Policy Act and Natural Gas Act Compliance.  To the best of the Borrower's knowledge, all material filings and approvals under the Natural Gas Policy Act of 1978, as amended, and the Natural Gas Act, as amended, or with the Federal Energy Regulatory Commission (the "FERC") or required under any rules or regulations adopted by the FERC which are necessary for the operation of the Borrower's businesses or the Collateral in the manner in which they are presently being operated have been made and the terms of the agreements and contractual rights included in the Borrower's businesses or the Collateral do not conflict with or contravene any such Law, rule or regulation.

7.19    Take or Pay Obligations, Prepayments, BTU Adjustments and Balancing Problems.  To the best of the Borrower's knowledge, after diligent inquiry, there is no take or pay obligation under any gas purchase agreement comprising a portion of the Collateral which is not matched by a commensurate and corresponding pay or take obligation binding upon the purchaser under a corresponding gas sales agreement such that with respect to the ownership and operation of the business of the Borrower or the Collateral, any such obligation in favor of any seller under any gas purchase agreement to which the Borrower is a "buyer" is matched by a corresponding obligation on the part of "purchasers" under corresponding gas sales agreements pursuant to which the Borrower is the "seller".  To the best of Borrower's knowledge following a due diligent inquiry thereby, neither the Borrower nor the Collateral is subject to requirements to make BTU adjustments or effect gas balancing in favor of third parties which would result in the Borrower being required to (i) deliver gas at a price below that established in applicable gas sales agreements or on behalf of and for the benefit of third parties in exchange or to otherwise compensate for prior above market or above contract purchases of gas from the Borrower or its predecessors in interest, or (ii) balance in kind by allowing other owners in the Collateral to make up the past imbalances in gas sales, or (iii) balance in cash by paying other owners of the collateral for the past gas imbalances except for the matters described on Exhibit "E" hereto which have been disclosed to the Borrower.

7.20    Gas Purchase Obligations in Excess of Gas Sales Rights.  The ownership and operation of the business operations of the Borrower or the Collateral have not resulted or will not result in the existence of minimum purchase obligations under any gas purchase agreement (relating to the volume of gas to be taken thereunder or the price to be paid with respect thereto for the duration of any such gas purchase agreement) which are not matched by corresponding and commensurate rights to sell all such gas under applicable gas sales agreements at prices in excess of the amount to be paid therefor under gas purchase agreements (without regard to costs associated with transporting any such gas and risks of volume "shrinkage" occurring in the transportation process).

7.21    Anti Terrorism.

(a)    Borrower is not in violation in any material respects of any United States Requirements of Law relating to terrorism, sanctions or money laundering (the "Anti-

38

Terrorism Laws"), including the United States Executive Order No. 13224 on Terrorist Financing (the "Anti-Terrorism Order") and the Patriot Act.

(b)    Borrower (i) is not listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (ii) is not owned or controlled by, or acting for or on behalf of, any person listed in the annex to, or is otherwise subject to the provisions of, the Anti-Terrorism Order, (iii) does not commit, threaten or conspire to commit or supports "terrorism" as defined in the Executive Order or (iv) is not named as a "specially designated national and blocked person" in the most current list published by the U.S. Treasury Department Office of Foreign Assets Control.

(c)    Borrower does not (i) conduct any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in clauses (b)(i) through (b)(iv) above, (ii) deal in, or otherwise engage in any transactions relating to, any property or interests in property blocked pursuant to the Anti-Terrorism Order or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

7.23    Solvency. The Borrower and its entity Affiliates and Subsidiaries (and with respect to its entity Affiliates and Subsidiaries, after taking into account each entity Affiliate's and Subsidiary's rights of contribution), on a consolidated basis, are not insolvent, the Borrower's and its entity Affiliates and Subsidiaries' assets (and with respect to its entity Affiliates and Subsidiaries, after taking into account each entity Affiliate's and Subsidiary's rights of contribution), on a consolidated basis, exceed their liabilities, and neither the Borrower nor any of its entity Affiliates and Subsidiaries (and with respect to its entity Affiliates and Subsidiaries, after taking into account each entity Affiliate's and Subsidiary's rights of contribution) will be rendered insolvent by the execution and performance of this Agreement and the Loan Documents.

7.24    Additional Swap Agreement Representations. Each Borrower hereby represents and warrants to Agent, Lenders and Letter of Credit Issuer and covenants with the Agent, Lenders and Letter of Credit Issuer that:

(a) the rate, asset, liability or other notional item underlying any specified Swap Agreement regarding an interest or monetary rate, or foreign exchange swap, entered into or executed in connection with this Agreement is or is directly related to, a financial term hereof;

(b) the aggregate notional amount of all Swap Agreements entered into or executed by any Borrower in connection with the financial terms of this Agreement, whether entered into or executed with Borrower or any other individual or entity, will not at any time exceed the aggregate principal amount outstanding hereunder, as such amounts may be determined or calculated contemporaneously form time to time during and throughout the terms of this Agreement;

39

(c) each Swap Agreement entered into or executed in connection with the financial terms of this Agreement has been or will be entered into no earlier than ninety (90) days before and no later than one hundred eighty (180) days after the date hereof or of any transfer of principal hereunder;

(d) the purpose of any Swap Agreement in respect of any commodity entered into or executed in connection with this Agreement is to hedge commodity price risks incidental to Borrower's business and arising from potential changes in the price of such commodity; and

(e) each Swap Agreement entered into or executed in connection with this Agreement mitigates against the risk of repayment hereof and is not for the purpose of speculation.

For purposes hereof, the term (i) "financial term" shall include, without limitation, the duration or term of this Agreement, rate of interest, the currency or currencies in which the Loan is made and its principal amount, and (ii) "transfer of principal" means any draw of principal under this Agreement, any amendment, restructuring, extension or other modification of this Agreement.

7.25    Provisions Ensuring all Swap Obligations are with an ECP.    Each Qualified ECP Guarantor, if any, hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations and liabilities under such Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this **Section 7.25** for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this **Section 7.25** or otherwise under such Guaranty, as it relates to such other Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).    Each Qualified ECP Guarantor intends that this Section constitute, and this **Section 7.25** shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of **Section 1a(18)(A)(v)(II)** of the Commodity Exchange Act.

## ARTICLE XIII

## EVENTS OF DEFAULT

8.1    Events of Default.    The occurrence of any one or more of the following events shall constitute an Event of Default hereunder (whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of Law or otherwise):

(a) The Borrower shall fail to make any payment or prepayment of principal or interest upon any of the Revolver Notes, or fail to pay any Swaps or other Indebtedness after the same shall become due and payable (whether by extension, renewal, acceleration or otherwise); or

(b) Any representation or warranty of the Borrower made herein or in any writing furnished in connection with or pursuant to any of the Loan Documents or Swaps shall have been false or misleading in any material respect on the date when made and

continues to have a material adverse effect on the Borrower or its financial capacity or business operations; or

(c)     The Borrower shall fail to duly observe, perform or comply with any covenant, agreement or term (other than payment provisions which are governed by **Section 8.1(a)** hereof) contained in this Agreement or any of the Loan Documents and such default or breach shall have not been cured or remedied within the earlier of thirty (30) days after the Borrower shall know (or should have known) of its occurrence or twenty (20) days following receipt of notice thereof from the Agent; or

(d)     The Borrower shall default in the payment of principal or of interest on any other obligation for money borrowed or received as an advance (or any obligation under any conditional sale or other title retention agreement, or any obligation issued or assumed as full or partial payment for property whether or not secured by purchase money Lien, or any obligation under notes payable or drafts accepted representing extensions of credit) in excess of $250,000 beyond any grace period provided with respect thereto, or shall default in the performance of any other agreement, term or condition contained in any agreement under which such obligation is created (or if any other default under any such agreement shall occur and be continuing beyond any period of grace provided with respect thereto) if the effect of such default is to cause the holder or holders of such obligation (or a trustee on behalf of such holder or holders) to accelerate the due date of such obligation prior to its scheduled date of maturity; or

(e)     Any of the following: (i) the Borrower or any Guarantor shall become insolvent or unable to pay its or his debts as they mature, make an assignment for the benefit of creditors or admit in writing its or his inability to pay its or his debts generally as they become due or fail generally to pay its or his debts as they mature; or (ii) an order, judgment or decree is entered adjudicating the Borrower or any Guarantor bankrupt or insolvent; or (iii) the Borrower or any Guarantor shall petition or apply to any Tribunal for the appointment of a trustee, receiver, custodian or liquidator of the Borrower or any Guarantor or of any substantial part of the assets of the Borrower or any Guarantor, or shall commence any proceedings relating to the Borrower or any Guarantor under any bankruptcy, reorganization, compromise, arrangement, insolvency, readjustment of debts, dissolution, or liquidation Law of any jurisdiction, whether now or hereafter in effect; or (iv) any such petition or application shall be filed, or any such proceedings shall be commenced, of a type described in **subsection (iii)** above, against the Borrower or any Guarantor and the Borrower or any Guarantor by any act shall indicate its approval thereof, consent thereto or acquiescence therein, or an order, judgment or decree shall be entered appointing any such trustee, receiver, custodian or liquidator, or approving the petition in any such proceedings, and such order, judgment or decree shall remain unstayed and in effect, if being vigorously contested, for more than sixty (60) days; or (v) any order, judgment or decree shall be entered in any proceedings against any Borrower or any Guarantor decreeing the dissolution of the Borrower or any Guarantor and such order, judgment or decree shall remain unstayed and in effect for more than thirty (30) days; or (vi) any order, judgment or decree shall be entered in any proceedings against the Borrower or any Guarantor decreeing a split-up of the Borrower or any Guarantor which requires the divestiture of a substantial part of the assets of the Borrower or any

41

Guarantor, and such order, judgment or decree shall remain unstayed and in effect for more than thirty (30) days; or (vii) the Borrower or any Guarantor shall fail to make timely payment or deposit of any amount of tax required to be withheld by the Borrower and paid to or deposited to or to the credit of the United States of America pursuant to the provisions of the Internal Revenue Code of 1986, as amended, in respect of any and all wages and salaries paid to employees of the Borrower or any Guarantor; or

(f)      Any final judgment on the merits for the payment of money in an amount in excess of $250,000 (after exclusion of such uncontested amounts fully covered by insurance after deduction of any deductible amount) shall be outstanding against the Borrower or any Guarantor, and such judgment shall remain unstayed and in effect and unpaid for more than thirty (30) days; or

(g)      Any Reportable Event described in **Section 7.13** hereof which the Agent determines in good faith might constitute grounds for the termination of a Plan therein described or for the appointment by the appropriate United States District Court of a trustee to administer any such Plan shall have occurred and be continuing thirty (30) days after written notice to such effect shall have been given to the Agent by the Borrower, or any such Plan shall be terminated, or a trustee shall be appointed by a United States District Court to administer any such Plan or the Pension Benefit Guaranty Corporation shall institute proceedings to terminate any such Plan or to appoint a trustee to administer any such Plan; or

(h)      Any default or event of default occurs under any of the other Loan Documents, including without limitation, the Security Agreement, (including, without limitation, any of the Security Instruments or other Loan Documents therein described or defined); or

(i)      Any Guarantor violates or breaches the terms and provisions of its or his Guaranty or any Guarantor shall repudiate or attempt to repudiate or otherwise cancel or terminate its or his Guaranty Agreement or any Guaranty shall be determined to be void or unenforceable.

(j)      Any event of default, termination event or additional termination event occurs under any Swap between Borrower or Mortgagor Affiliate and Swap Counterparty.

8.2      Remedies.  Upon the occurrence of any Event of Default referred to in **Section 8.1(e)** the Revolving Credit Commitment shall immediately terminate, and the Revolver Notes and all other Indebtedness shall be immediately due and payable, without notice of any kind. Upon the occurrence of any other Event of Default, and without prejudice to any right or remedy of the Agent under this Agreement or the Loan Documents or under applicable Law of under any other instrument or document delivered in connection herewith, the Agent may (i) declare the Revolving Credit Commitment terminated, or (ii) declare the Revolving Credit Commitment terminated and declare the Revolver Notes and the other Indebtedness, or any part thereof, to be forthwith due and payable, whereupon the Revolver Notes and the other Indebtedness, or such portion as is designated by the Agent shall forthwith become due and payable, without

42

presentment, demand, notice or protest of any kind, all of which are hereby expressly waived by the Borrower. No delay or omission on the part of the Agent in exercising any power or right hereunder or under the Revolver Notes, the Loan Documents or under applicable law shall impair such right or power or be construed to be a waiver of any default or any acquiescence therein, nor shall any single or partial exercise by the Agent of any such power or right preclude other or further exercise thereof or the exercise of any other such power or right by the Agent. In the event that all or part of the Indebtedness becomes or is declared to be forthwith due and payable as herein provided, the Agent shall have the right to set off the amount of all the Indebtedness of the Borrower owing to the Agent against, and shall have, and is hereby granted by the Borrower, a lien upon and security interest in, all property of the Borrower in the Agent's possession at or subsequent to such default, regardless of the capacity in which the Agent possesses such property, including but not limited to any balance or share of any deposit, collection or agency account. After Default all proceeds received by the Agent may be applied to the Indebtedness in such order of application and such proportions as the Agent, in its discretion, shall choose. At any time after the occurrence of any Event of Default, the Agent may, at its option, cause an audit of any and/or all of the books, records and documents of the Borrower to be made by auditors satisfactory to the Agent at the expense of the Borrower. The Agent also shall have, and may exercise, each and every right and remedy granted to it for default under the terms of the Security Instruments and the other Loan Documents.

8.3     <u>Allocation of Payments after Event of Default</u>.   Notwithstanding any other provisions of this Agreement to the contrary, after the occurrence and during the continuance of an Event of Default, all amounts collected or received on or in respect of the Indebtedness (or other amounts owing under the Loan Documents in connection therewith) shall be paid over or delivered in accordance with any Intercreditor Agreement or if no Intercreditor Agreement is in place, in the Agent's discretion.

8.4     <u>Setoff</u>.  Upon the occurrence of an Event of Default which shall be continuing, any indebtedness from Agent, any Lender or Letter of Credit Issuer to Borrower, including without limitation, under any general or special deposit account, may be setoff or otherwise applied by Agent, under a general lien covering such indebtedness which is hereby granted, to any obligation of Borrower under this Agreement to Agent, any Lender or Letter of Credit Issuer at any time and from time to time, either before or after maturity and without demand or notice to anyone. The rights granted by this paragraph shall be in addition to the rights of Agent, Lenders, Letter of Credit Issuer or any of them, under statutory banker's lien or other rights of setoff.

8.5     <u>Non-waiver of Rights</u>.  No delay or omission to exercise any right, power or remedy accruing to Agent upon any breach or default of Borrower under this Agreement or any of the Loan Documents or other agreements or instruments executed pursuant hereto or in connection herewith shall impair any such right, power or remedy of Agent, nor shall it be construed to be a waiver of any such breach or default or any acquiescence therein, or of any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default heretofore occurring. Any waiver, permit, consent or approval of any kind of character on the part of Agent or Lenders, or any breach or default or conditions in the making of any loan under this Agreement, or any waiver on the part of Agent or Lenders of any condition or provision of this Agreement or any agreement

2643850.11

or instrument executed pursuant hereto or in connection herewith, must be in writing signed by Agent and shall be effective only to the extent of the provisions of such writing specifically set forth. All other remedies, either under this Agreement or by Law otherwise afforded Agent, shall be cumulative and not alternative.

## ARTICLE IX

## LOAN OPERATIONS

9.1     Interests in Loans/Commitments. Each of the Lenders, as well as each Lender that may hereafter become an Assignee or Credit Participant pursuant to **Article X** hereof, for the amount of Indebtedness not in excess of the aggregate Revolving Credit Commitment shall be evidenced by an additional Revolver Note(s) issued hereunder by Borrower to the order of such additional Lender in form and content similar to the applicable form of Revolver Notes executed by the existing Lenders (in which event such existing Revolver Notes of the selling Lender would be reissued concurrently therewith in a correspondingly reduced original principal amount). In no event shall the aggregate outstanding principal amount of all Revolver Notes issued hereunder exceed the Revolving Credit Commitment Amount in all of the Revolver Notes and Letter of Credit Exposure and the Revolving Credit Commitment, which shall be computed for each existing Lender as more particularly set forth in **Schedule I** annexed hereto, as modified, supplemented and amended from time to time in connection with **Section 10.4**. The respective Percentage Interests of Lenders as from time to time in effect and reflected in the Register, are referred to as the Percentage Interest with respect to all or any portion of the Revolving Credit Loans, the Advancing Loans, the Letters of Credit and the Revolving Credit Commitment. Lenders signatory hereto have no obligation to increase the Revolving Credit Commitment above either such Lender's respective existing Percentage Interest or applicable Revolver Commitment Amount or, in the aggregate for all of Lenders, to an amount in excess of the aggregate amount of applicable Revolving Credit Commitments set forth on **Schedule I**, as revised and supplemented from time to time, and any future determination of Lenders to increase their individual Revolver Commitment Amount shall be in Lenders' sole and absolute discretion and, if applicable, subject to such Lender obtaining Assignee(s) or Credit Participant(s) under **Article XII** hereof for all amounts of the respective Revolver Commitment Amount(s) in excess of the existing maximum amount of such amount(s).

9.2     Authority to Act. Each of Lenders appoints and authorizes Agent to act for Lenders as agent ("Agent") in connection with the transactions contemplated by this Agreement and the other Loan Documents on the terms set forth herein. In acting hereunder, Agent is acting for the account of CrossFirst Bank to the extent of its Percentage Interest, and, in each such instance Agent is also acting for the account of each other Lender to the extent of such Lender's Percentage Interest, and all action in connection with the enforcement of, or the exercise of any remedies (other than Lenders' rights of set-off as provided herein or in any other Loan Document) in respect of the Collateral shall be taken by Agent in accordance herewith. Each of Lenders now or hereafter signatory party hereto shall initially and primarily contact and deal with Agent insofar as loan operations and remedial or other actions are concerned in connection with the Loans, Borrower and the compliance of Borrower with their liabilities, duties and obligations hereunder and under the other Loan Documents. The amounts payable at any time under the Loan Documents to each Lender shall be a separate and independent debt, and each

Lender shall be entitled to protect and enforce its rights arising under this Agreement and the other Loan Documents and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

9.3     Borrower to Pay Agent.  Borrower shall be fully protected in making all payments in respect of the Revolver Notes evidencing the Loans to Agent, in relying upon consents, modifications and amendments executed by Agent purportedly on Lenders' behalf, and in dealing with Agent as herein provided.  Upon three (3) Business Days notice, Agent may charge the accounts of Borrower, on the dates when the amounts thereof become due and payable, with the amounts of the principal of and interest on the Loans, including any amounts paid by Agent to third parties under Letters of Credit or drafts presented thereunder, commitment fees, Letter of Credit issuance fees and fronting or processing/application fees pertaining thereto, commitment fees, Non-Usage Fees, and all other fees and amounts owing under any Loan Document.

9.4     Lender Operations for Advances, Letters of Credit.

(a)     Advances.  On the funding date for each Loan evidenced by a Revolver Note, each Lender shall advance to Agent in immediately available funds such Lender's Percentage Interest in the portion of a Loan advanced on such funding date prior to 11:00 o'clock a. m. (applicable current time in Tulsa, Oklahoma).  If such funds are not received at such time, but all applicable conditions set forth in **Article V** have been satisfied, each Lender authorizes and requests Agent to advance for such Lender's account, pursuant to the terms hereof, the Lender's respective Percentage Interest in such portion of such Loan and agrees to reimburse Agent in immediately available funds for the amount thereof prior to 2:00 o'clock p.m. (applicable current time in Tulsa, Oklahoma) on the day any portion of such Loan is advanced hereunder; provided, however, that Agent is not authorized to make any such advance for the account of any Lender who has previously notified Agent in writing that such Lender will not be performing its obligations to make further advances hereunder; and provided, further, that Agent shall be under no obligation to make any such advance.

(b)     Letters of Credit.  Each of Lenders authorizes and requests Agent to issue the Letters of Credit provided for in **Article II** and agrees to purchase a participation in each of such Letters of Credit in an amount equal to its Percentage Interest in the amount of each such Letter of Credit in return for its Percentage Interest of the letter of credit issuance fees associated with such Letters of Credit pursuant to **Section 2.5**.  Promptly upon the request of Agent, each Lender shall reimburse Agent in immediately available funds for such Lenders Percentage Interest in the amount of all Indebtedness to third parties incurred by the Agent in respect of each Letter of Credit and each draft accepted under a Letter of Credit to the extent not timely reimbursed by Borrower.  Agent will notify each Lender of the issuance of each Letter of Credit, the amount and date of payment of any draft drawn or accepted under a Letter of Credit and whether in connection with the payment of any such draft the amount thereof was added to the Revolver Loans or was reimbursed by Borrower.

(c)     Agent to Allocate Payments. All payments of principal and interest in respect of the extensions of credit made pursuant to this Agreement, reimbursement of

45

amounts paid by each Letter of Credit Issuer to third parties under Letters of Credit or drafts presented thereunder, Letter of Credit issuance fees, commitment fees, and other fees under this Agreement (except only for the $200.00 standard Letter of Credit application/processing fees of any Letter of Credit Issuer, which shall not be shared by Lenders but shall be attributable solely to the applicable Letter of Credit Issuer), shall, as a matter of convenience, be made by Borrower to the applicable Letter of Credit Issuer or Agent, as the case may be. The share of each Lender shall be credited to such Lender by Agent in immediately available funds in such manner that the principal amount of the Loans to be paid shall be paid proportionately in accordance with Lenders' respective Percentage Interests in such Loans, except as otherwise provided in this Agreement.

(d) **Delinquent Lenders; Nonperforming Lenders.** In the event that any Lender fails to reimburse Agent pursuant to **Section 9.4(a)** for the Percentage Interest of such Lender (a "Delinquent Lender") in any credit advanced by Agent pursuant hereto at a time when Borrower is not in Default hereunder, overdue amounts (the "Delinquent Payment") due from the Delinquent Lender to Agent shall bear interest, payable by the Delinquent Lender on demand, at a per annum rate equal to (a) the Federal Funds Rate for the first three days overdue and (b) the sum of two percentage points (2%) plus the Federal Funds Rate for any longer period. Such interest shall be payable to Agent for its own account for the period commencing on the date of the Delinquent Payment and ending on the date the Delinquent Lender reimburses Agent on account of the Delinquent Payment (to the extent not paid by Borrower as provided below) and the accrued interest thereon (the "Delinquency Period"), whether pursuant to the assignments referred to below or otherwise. Upon notice by Agent, Borrower will pay to Agent the principal (but not the interest) portion of the Delinquent Payment. During the Delinquency Period, in order to make reimbursements for the Delinquent Payment and accrued interest thereon, the Delinquent Lender shall be deemed to have assigned to Agent all interest, commitment fees and other payments made by Borrower hereunder that would have thereafter otherwise been payable under the Loan Documents to the Delinquent Lender. During any other period in which any Lender is not performing its obligations to extend credit under **Article II** hereof (a "Nonperforming Lender"), the Nonperforming Lender shall be deemed to have assigned to each Lender that is not a Nonperforming Lender (a "Performing Lender") all principal and other payments made by Borrower that would have thereafter otherwise been payable thereunder to the Nonperforming Lender. Agent shall credit a portion of such payments to each Performing Lender in an amount equal to the Percentage Interest of such Performing Lender divided by one minus the Percentage Interest of the Nonperforming Lender until the respective portions of the Loans owed to all Lenders are the same as the Percentage Interests of Lenders immediately prior to the failure of the Nonperforming Lender to perform its obligations under **Article II** hereof. The foregoing provisions shall be in addition to any other remedies Agent, the Performing Lenders or Borrower may have under Law or equity against the Delinquent Lender as a result of the Delinquent Payment or against the Nonperforming Lender as a result of its failure to perform its obligations under **Article II** hereof.

9.5     Sharing of Payments. [Intentionally omitted].

46

9.6     Amendments, Consents, Waivers.  Except as otherwise set forth herein, Agent may (and upon the written request of the Required Lenders the Agent shall) take or refrain from taking any action under this Agreement or any other Loan Document.  No modification, forbearance or waiver of compliance with any covenant, term or condition in this Agreement or any other Loan Document or any Default or Event of Default shall be binding upon all of Lenders unless consented to in writing by the Required Lenders (as calculated pursuant to the respective Percentage Interests specified in **Section 9.1** above (other than Delinquent Lenders during the existence of a Delinquency Period so long as such Delinquent Lender is treated the same as the other Lenders with respect to any proposed action); provided, however, that without the written consent of each Lender (other than Delinquent Lenders during the existence of a Delinquency Period so long as such Delinquent Lender is treated the same as the other Lenders with respect to any actions enumerated below):

(a)     no reduction or waiver shall be made in (A) the amount of principal of any of the Loans, reimbursement obligations for payments made under Letters of Credit or any other payment obligations, (B) interest rate on the Revolver Notes, (C) the Letter of Credit issuance fees (excluding, however, Letter of Credit fronting and/or processing/application fees, the amount of which shall be within the reasonable discretion of each applicable Letter of Credit Issuer), (D) Commitment fees or non-usage fees, or (E) the MCR amount;

(b)     no change shall be made in the stated time of payment of all or any portion of any of the Revolver Notes or interest thereon or reimbursement of payments made under Letters of Credit or fees relating to any of the foregoing payable to all of Lenders and no waiver shall be made of any Default or Event of Default under **Section 8.1(a)**;

(c)     subject to the provisions of **Section 10.4**, no increase shall be made in the amount, or extension of the term, of any of the Commitments or the Collateral Borrowing Base amount;

(d)     no alteration shall be made of Lenders' rights of set-off contained herein or in the other Loan Documents, or of the *pro rata* sharing provisions of **Section 10.5** or any waterfall, payment or distribution priority provisions of the Loan Documents;

(e)     no release of any Collateral, other than cash Collateral released in the ordinary course of business or sales of business ownership interests for fair value, shall be made in excess of $500,000 in the aggregate during any consecutive twelve (12) month period (except that Agent may release particular items of Collateral in dispositions permitted by the Security Instruments in accordance with the terms and provisions thereof and may release all of the Collateral upon the payment in full of the Loans and all other Indebtedness and termination or extinguishment of the Commitments without the written consent of Lenders);

(f)     no extension of the stated expiration date of any Letter of Credit beyond the stated final maturity date of the Revolver Notes shall be made;

(g)     no release of Borrower or any Guarantor shall be made; or

(h)    no amendment to, modification of or waiver to **Section 2.2**, **Article V**, this **Section 9.6**, **Section 9.7**, **Section 10.4**, the definition of "Required Lenders", the definition of or provisions relating to determining a Lender's "Percentage Interest" or any other provision of the Loan Documents that provides for the consent of all Lenders shall be made.

9.7    Agent's Resignation. Agent may resign at any time by giving at least thirty (30) days' prior written notice of its intention to do so to each other Lender and Borrower and upon the appointment by the Required Lenders of a successor Agent satisfactory to Borrower (so long as no Event of Default exists). If no successor Agent shall have been so appointed and shall have accepted such appointment within 45 days after the retiring Agent's giving of such notice of resignation, then the retiring Agent may with the consent of Borrower (so long as no Event of Default exists), which shall not be unreasonably withheld, appoint a successor Agent which shall be a Lender, Swap Counterparty or a trust company organized under the Laws of the United States of America or any state thereof and having a combined capital, surplus and undivided profit of at least $175,000,000; provided, however, that any successor Agent appointed under this sentence may be removed upon the written request of the Required Lenders. Upon the appointment of a new Agent hereunder, the term "Agent" shall for all purposes of the Loan Documents thereafter mean such successor. After any retiring Agent's resignation hereunder as Agent, or the removal hereunder of any successor Agent, the provisions of the Loan Documents shall continue to inure to the benefit of such Agent as to any actions taken or omitted to be taken by it while it was Agent under the Loan Documents. Upon the written direction of the Required Lenders, any Agent may be removed for cause, then the removal of any Agent for cause shall automatically cause such Person to be removed in its capacity as the other Agent, and the Required Lenders may appoint one or more Persons as successor Agent, contemporaneously with, upon or after such removal.

9.8    Concerning Agents.

(a)    Action in Good Faith. Agent and its officers, directors, employees and agents shall be under no liability to any Lenders or to any future holder of any interest in the Indebtedness for any action or failure to act taken or suffered in good faith, other than gross negligence or willful misconduct and any action or failure to act in accordance with an opinion of its counsel shall conclusively be deemed to be in good faith. Agent shall in all cases be entitled to rely, and shall be fully protected in relying, on instructions given to Agent by the Required Lenders.

(b)    No Implied Duties. Agent shall have and may exercise such powers as are specifically delegated to Agent under this Agreement or any other Loan Document together with all other powers incidental thereto. Agent shall not have any implied duties to any Person or any obligation to take any action under this Agreement or any other Loan Document except for action specifically provided for in this Agreement or any other Loan Document to be taken by Agent. Before taking any action under this Agreement or any other Loan Document, Agent may request an appropriate specific indemnity satisfactory to it from each Lender in addition to the general indemnity provided for in **Section 9.11**. Until Agent has received such specific indemnity, Agent shall not be obligated to take (although Agent may in its sole discretion take) any such

48

action under this Agreement or any other Loan Document. Each Lender confirms that Agent does not have a fiduciary relationship to them under the Loan Documents. Borrower confirms that neither Agent nor any other Lender has a fiduciary relationship to them under the Loan Documents.

(c)     Validity.  Agent shall not be responsible to any Lender or any future holder of any interest in the Loans and Indebtedness (a) for the legality, validity, enforceability or effectiveness of this **Agreement** or any other Loan Document, (b) for any recitals, reports, representations, warranties or statements contained in or made in connection with this Agreement or any other Loan Document, (c) for the existence or value of any assets included in any security for the Loans and Indebtedness, (d) for the effectiveness of any Lien purported to be included in the Collateral, (e) for the specification or failure to specify any particular assets to be included in the Collateral, or (f) unless Agent shall have failed to comply with **Section 9.8(a)**, for the perfection of the security interests in the Collateral.

(d)     Compliance.  Agent shall not be obligated to ascertain or inquire as to the performance or observance of any of the terms of this Agreement or any other Loan Document; and in connection with any extension of credit under this Agreement or any other Loan Document, Agent shall be fully protected in relying on certificates of Borrower as to the fulfillment by Borrower of any conditions to such extension of credit.

(e)     Employment by Agent of Counsel.  Agent may execute any of their respective duties under this Agreement or any other Loan Document by or through employees, agents and attorneys-in-fact and shall not be responsible to any of Lenders or Borrower for the default or misconduct of Agent or attorney-in-fact selected thereby acting in good faith except for gross negligence or willful misconduct. Agent shall be entitled to advice of counsel concerning all matters pertaining to the agency hereby created and its duties hereunder or under any other Loan Document.

(f)     Reliance on Documents and Counsel.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any affidavit, certificate, cablegram, consent, instrument, letter, notice, order, document, statement, telecopy, telegram, telex or teletype message or writing reasonably believed in good faith by Agent to be genuine and correct and to have been signed, sent or made by the Person in question, including any telephonic or oral statement made by such Person, and, with respect to legal matters, upon an opinion or the advice of counsel selected by Agent.

(g)     Reimbursement.  Each of Lenders severally agrees to reimburse Agent, in the amount of such Lender's Percentage Interest, for any reasonable expenses not reimbursed by Borrower (without limiting the obligation of Borrower to make such reimbursement): (a) for which Agent is entitled to reimbursement by Borrower under this Agreement or any other Loan Document, and (b) after the occurrence of a Default, or an Event of Default, for any other reasonable expenses incurred by Agent on Lenders' behalf in connection with the enforcement of Lenders' rights under this Agreement or any other Loan Document.

9.9     Rights as a Lender.  With respect to any Loan(s) or advance(s) extended by them hereunder, Agent shall have the same rights, obligations and powers hereunder as any other Lender and may exercise such rights and powers as though it were not an Agent, and unless the context otherwise specifies, Agent shall be treated in its individual capacity as though it were not Agent hereunder.  Notwithstanding the foregoing, Agent shall give prompt notice to Lenders and Swap Counterparty of its exercise of any rights and powers with respect acceleration or realization upon Collateral pursuant to any Default.  Without limiting the generality of the foregoing, except to the extent specifically provided herein to the contrary, the Percentage Interest of a Lender serving in the capacity as an Agent shall be included in any computations of Percentage Interests.  Agent and its Affiliates may accept deposits from, lend money to, act as trustee for and generally engage in any kind of banking or trust business with Borrower, any of Borrower's Subsidiaries or any Affiliate of any of them and any Person who may do business with or own an equity interest in Borrower, any of their Subsidiaries or any Affiliate of any of them, all as if Agent were not Agent and without any duty to account therefor to the other Lenders.

9.10    Independent Credit Decision.    Each of Lenders acknowledges that it has independently and without reliance upon Agent, based on the financial statements and other documents referred to in **Section 3.3**, on the other representations and warranties contained herein and on such other information with respect to Borrower and its Subsidiaries or Affiliates as such Lender deemed appropriate, made such Lender's own credit analysis and decision to enter into this Agreement and to make the extensions of credit provided for hereunder.  Each Lender represents to Agent that such Lender will continue to make its own independent credit and other decisions in taking or not taking action under this Agreement or any other Loan Document.  Each Lender expressly acknowledges that neither Agent nor any of its officers, directors, employees, agent, attorneys-in-fact or Affiliates has made any representations or warranties to such Lender, and no act by Agent taken under this Agreement or any other Loan Document, including any review of the affairs of Borrower and its Subsidiaries and Affiliates, shall be deemed to constitute any representation or warranty by Agent.  Except for notices, reports and other documents expressly required to be furnished to each Lender by Agent under this Agreement or any other Loan Document, Agent shall have no duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition, financial or otherwise, or creditworthiness of Borrower or any Subsidiary which may come into the possession of Agent or any of its officers, directors, employees, agent, attorneys-in-fact or Affiliates.

9.11    Indemnification.  The holders of the Indebtedness (including, without limitation, CrossFirst Bank in its corporate capacity, to the extent it is the holder of any Indebtedness) shall indemnify Agent and its officers, directors, employees (to the extent Agent is not reimbursed by Borrower and without limiting the obligation of Borrower to do so), *pro rata* in accordance with their respective Percentage Interests, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time be imposed on, incurred by or asserted against Agent or such Persons relating to or arising out of this Agreement, any other Loan Document, the transactions contemplated hereby or thereby, or any action taken or omitted by Agent in connection with any of the foregoing; provided, however, that the foregoing shall not extend to the loss of principal or interest on the loan advances evidenced by the Revolver Notes (of such Agent(s) as one of

50

Lenders) or to actions or omissions which are taken by Agent or such Persons in bad faith, with gross negligence or willful misconduct.

## ARTICLE X

## ASSIGNMENTS/PARTICIPATIONS

10.1   Successors and Assigns; Lender Assignment and Participations. Any reference in this Agreement to any party hereto shall be deemed to include the successors and assigns of such party, and all covenants and agreements by or on behalf of Borrower, Agent or Lenders that are contained in this Agreement or any other Loan Documents shall bind and inure to the benefit of their respective successors and assigns; provided, however, that (a) Borrower may not assign their rights or obligations under this Agreement without the prior written consent of Lenders, and (b) Lenders shall be not entitled to assign their respective Percentage Interests in the Loans or other Indebtedness evidenced by the Revolver Notes hereunder except as set forth below in **Section 10.2**.

10.2   Assignments by Lenders.

(a)   Assignees and Assignment Procedures.  Each Lender may (i) without the consent of Agent or Borrower if the proposed assignee is already a Lender hereunder or an Affiliate of the same corporate parent of which the assigning Lender is a Subsidiary, or (ii) otherwise with the consent of Agent (which such consent will not be unreasonably withheld and shall be deemed granted if Agent fail to object to such assignment within ten (10) days after notice thereof), in compliance with applicable Laws in connection with such assignment, assign to one or more commercial lenders or other financial institutions (each, an "Assignee") all or a portion of its interests, rights and obligations under this Agreement and the other Loan Documents, including all or a portion, which need not be *pro rata* among the Loans and the Letter of Credit Exposure, of its Commitment, the portion of the Loans and Letter of Credit Exposure at the time owing to it and the Revolver Notes held by it, but excluding its rights and obligations as Agent; provided, however, that:

(i)   the aggregate amount of the Commitments of the assigning Lender subject to each such assignment to any Assignee other than another Lender (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to Agent) shall be not less than $5,000,000 and in increments of $500,000 in excess thereof; and

(ii)   the parties to each such assignment shall execute and deliver to Agent an Assignment and Acceptance (the "Assignment and Acceptance") in the form satisfactory to Agent, together with the Revolver Notes subject to such assignment.

Notwithstanding anything in this Agreement to the contrary, in no event may any of Borrower or any of their respective Affiliates (each a "Restricted Person") constitute or become a Lender hereunder, and any purported or attempted assignment made in

51

violation of the preceding sentence to any Restricted Person shall automatically be null and void and without legal effect.

Upon acceptance and recording pursuant to **Section 10.2(d)**, (which acceptance and recording shall be deemed to occur in any event three (3) Business Days following satisfaction of all other requirements hereunder) from and after the effective date specified in each Assignment and Acceptance (which effective date shall be at least three (3) Business Days after the execution thereof unless waived in writing by Agent): (x) the Assignee shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement; and (y) the assigning Lender shall, to the extent provided in such assignment, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to any interest and fees accrued for its account hereunder and not yet paid).

(b) <u>Terms of Assignment and Acceptance</u>. By executing and delivering an Assignment and Acceptance, the assigning Lender and Assignee shall be deemed to confirm to and agree with each other and the other parties hereto as follows:

(i) Other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto.

(ii) Such assigning Lender makes no representation or warranty and assumes no responsibility with respect to the consolidated financial condition of Borrower and its Subsidiaries or Affiliates or the performance or observance by Borrower or any of its Subsidiaries or Affiliates of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto.

(iii) Such Assignee confirms that it has received a copy of this Agreement, together with copies of the most recent quarterly or annual financial statements delivered pursuant hereto and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance.

(iv) Such Assignee will independently and without reliance upon Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement.

52

(v)     Such Assignee appoints and authorizes Agent to take such action as Agent on its behalf and to exercise such powers under this Agreement as are delegated to Agent by the terms hereof, together with such powers as are reasonably incidental thereto.

(vi)     Such Assignee agrees that it will perform in accordance with the terms of this Agreement all the obligations which are required to be performed by it as a Lender.

(c)     Register.  Agent may maintain at its main Tulsa, Oklahoma banking office a register (the "Register") for the recordation of (a) the names and addresses of Lenders and the Assignees which assume rights and obligations pursuant to an assignment under **Section 10.2(a)**, (b) the Percentage Interest of each such Lender as set forth in **Section 9.1** and (c) the amount of the Loans and Letter of Credit Exposure owing to each Lender from time to time, provided, the failure to maintain such Register shall not affect or release Borrower from their obligations under this Agreement or the other Loan Documents. The entries in the Register shall be conclusive, in the absence of manifest error, and Borrower, Agent and Lenders may treat each Person whose name is registered therein for all purposes as a party to this Agreement.  The Register shall be available for inspection by Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(d)     Acceptance of Assignment and Assumption.   Upon its receipt of a completed Assignment and Acceptance in the form of **Exhibit F** annexed hereto executed by an assigning Lender and an Assignee, in exchange for the Revolver Note(s) subject to such assignment, together with the Revolver Note(s) subject to such assignment, Agent shall (a) accept such Assignment and Acceptance, (b) record the information contained therein in the Register and (c) give prompt notice thereof to Borrower.  Within ten (10) days after receipt of notice, Borrower, at its own expense, shall execute and deliver to Agent, in exchange for the surrendered Revolver Note(s), a new Revolver Note(s) to the order of such Assignee in a principal amount equal to the applicable Commitment and Loans assumed by it pursuant to such Assignment and Acceptance and, if the assigning Lender has retained Commitment and Loans, a new Revolver Note(s) to the order of such assigning Lender in a principal amount equal to the applicable Commitments and its Percentage Interest in the Loans retained by it.  Such new Revolver Note(s) shall be in an aggregate principal amount equal to the aggregate principal amount of such surrendered Revolver Note(s), and shall be dated the date of the surrendered Revolver Note(s) which it or they replace.  All such Revolver Note(s) so replaced shall be delivered by Agent to Borrower or, alternatively, at Agent's election, marked appropriately to evidence the replacement thereof by such replacement Revolver Note(s).

(e)     Federal Reserve Bank.   Notwithstanding the foregoing provisions of this **Article X**, any Lender may at any time pledge or assign all or any portion of such Lender's rights under this Agreement and the other Loan Documents to a Federal Reserve Bank; provided, however, that no such pledge or assignment shall release such Lender from such Lender's obligations hereunder or under any other Loan Document.

(f)     _Further Assurances_. Borrower and its Subsidiaries and Affiliates shall sign such documents and take such other actions from time to time reasonably requested by an Assignee to enable it to share in the benefits of the rights created by the Loan Documents.

10.3     _Credit Participants_. Each Lender may, without the consent of Borrower or Agent, in compliance with applicable Laws in connection with such participation, sell to one or more commercial banks or other financial institutions (each a "Credit Participant") participations in minimum amounts of $2,000,000.00 each in all or a portion of its interests, rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Percentage Interest in the Commitments, the Loans owing to it and the Revolver Note(s) held by it); provided, however, that:

(a)     such Lender's obligations under this Agreement shall remain unchanged;

(b)     such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations;

(c)     the Credit Participant shall be entitled to the benefit of any cost protection provisions contained in this Agreement, but shall not be entitled to receive any greater payment thereunder than the selling Lender would have been entitled to receive with respect to the interest so sold if such interest had not been sold; and

(d)     Borrower, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right as one of Lenders to vote with respect to the enforcement of the obligations of Borrower relating to the Loans and Letter of Credit Exposure and the approval of any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications, consents or waivers described in **Section 9.6** as requiring the consent of each Lender).

Borrower agrees, to the fullest extent permitted by applicable Law, that any Credit Participant and any Lender purchasing a participation from another Lender pursuant to this **Section 10.3** may exercise all rights of payment (including the right of set-off), with respect to its participation as fully as if such Credit Participant or such Lender were the direct creditor of Borrower and a Lender hereunder in the amount of such participation. Upon receipt of notice of the address of each Credit Participant, Borrower shall thereafter supply such Credit Participants with the same information and reports communicated to Lenders. Borrower hereby acknowledges and agrees that Credit Participants shall be deemed a holder of the applicable Revolver Note(s) to the extent of their respective participation, and Borrower hereby waives their right, if any, to offset amounts owing to Borrower from Lenders against each Credit Participant's portion of the applicable Revolver Notes.

10.4     _Additional Lenders/Increase in Commitments by Existing Lenders_. This Agreement permits certain increases in an existing Lender's Commitment and the admission of new or additional Lenders ("Additional Lenders") providing new or increased Commitments, none of which requires any consents or approvals from the other Lenders or Swap Counterparties _unless_ the (i) Revolving Credit Commitment aggregate amount is increased above

$75,000,000.00 (provided, no Lender shall have any obligation to agree to any increase in such Lender's Commitment), or (ii) the economic terms associated with such increase in the Commitments vary from the economic terms set forth in this Agreement, in each of which such instances described in clauses (i), and/or (ii) above, each of Lenders must consent in writing. Any amendment hereto for such an addition of Additional Lenders shall be in form, scope and substance set forth on **Exhibit G** annexed hereto and shall require (i) the written signatures of Agent, Borrower and each of the Lender(s) being added or increasing its or their Commitment(s) and (ii) payment by Borrower to Agent for the allocable benefit of the additional or increased Lender the Loan origination fee required by **Section 2.7**. In addition, within a reasonable time after the effective date of any increase, Agent shall, and is hereby authorized and directed to, revise and supplement **Schedule I** reflecting such increase and shall distribute such revised **Schedule I** to each of Lenders and Borrower, whereupon such revised and supplemented **Schedule I** shall replace the old **Schedule I** and become part of this Agreement. On the Business Day following any such increase, all outstanding Letter of Credit Exposure and Revolver Loans shall be reallocated among Lenders (including any Additional Lender(s)) in accordance with Lenders' respective revised Percentage Interests, and all breakage funding losses of each Lender not so increasing its Revolving Credit Commitment shall be promptly paid by Borrower upon receipt of notice from each such Lender containing a reasonably detailed calculation of the amount thereof.

## ARTICLE XI

## MISCELLANEOUS

11.1    Notices.  Unless otherwise provided herein, all notices, requests, consents and demands shall be in writing and shall be either hand-delivered (by courier or otherwise) or mailed by certified mail, postage prepaid, to the respective addresses specified below, or, as to any party, to such other address as may be designated by it in written notice to the other parties:

|  |  |
|---|---|
| If to the Borrower: | NBI Properties, Inc.<br>823 South Detroit, Suite 300<br>Tulsa, Oklahoma  74120<br>Attn: Richard J. Nichols, President |
| If to the Agent: | CrossFirst Bank<br>7120 South Lewis Avenue<br>Tulsa, Oklahoma 74136<br>Attn: Henry Smith, Vice President/Energy Bank |

All notices forwarded or submitted hereunder will be effective when hand-delivered (via reputable courier system or otherwise by personal delivery) to the applicable notice address set forth above or when mailed by certified mail, postage prepaid, addressed as aforesaid.

11.2    Place of Payment.  All sums payable hereunder shall be paid in immediately available funds to the Agent, at its principal banking offices in Tulsa, Oklahoma, or at such other place as the Agent shall notify the Borrower in writing.  If any interest, principal or other payment falls due on a date other than a Business Day, then (unless otherwise provided herein)

such due date shall be extended to the next succeeding Business Day, and such extension of time will in such case be included in computing interest, if any, in connection with such payment.

11.3     Survival of Agreements.     All covenants, agreements, representations and warranties made herein shall survive the execution and the delivery of Loan Documents.  All statements contained in any certificate or other instrument delivered by the Borrower hereunder shall be deemed to constitute representations and warranties by the Borrower.

11.4     Parties in Interest.  All covenants, agreements and obligations contained in this Agreement shall bind and inure to the benefit of the respective successors and assigns of the parties hereto, except that the Borrower may not assign its rights or obligations hereunder without the prior written consent of the Agent and the Lenders.

11.5     Governing Law and Jurisdiction.  This Agreement and the Revolver Notes shall be deemed to have been made or incurred under the Laws of the State of Oklahoma and shall be construed and enforced in accordance with and governed by the Laws of Oklahoma.

**11.6     SUBMISSION     TO     JURISDICTION.       THE     BORROWER     HEREBY CONSENTS TO THE JURISDICTION OF ANY OF THE LOCAL, STATE, AND FEDERAL COURTS LOCATED WITHIN TULSA COUNTY, OKLAHOMA AND WAIVES ANY OBJECTION WHICH THE BORROWER MAY HAVE BASED ON IMPROPER VENUE OR FORUM NON CONVENIENS TO THE CONDUCT OF ANY PROCEEDING IN ANY SUCH COURT AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT, AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY MAIL OR MESSENGER DIRECTED TO IT AT THE ADDRESS SET FORTH IN SUBSECTION 11.1 HEREOF AND THAT SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON THE EARLIER OF ACTUAL RECEIPT OR THREE (3) BUSINESS DAYS AFTER MAILED OR DELIVERED BY MESSENGER.**

11.7     Maximum Interest Rate.  Regardless of any provision herein, the Lenders shall never be entitled to receive, collect or apply, as interest on the Indebtedness any amount in excess of the maximum rate of interest permitted to be charged by the Lenders by applicable Oklahoma Law, and, in the event the Lenders shall ever receive, collect or apply, as interest, any such excess, such amount which would be excessive interest shall be applied to other Indebtedness and then to the reduction of principal; and, if all other Indebtedness and principal are paid in full, then any remaining excess shall forthwith be paid to the Borrower.

11.8     No Waiver; Cumulative Remedies.  No failure to exercise, and no delay in exercising, on the part of the Agent, any right, power or privilege hereunder or under any other Loan Document or applicable Law shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege of the Agent.  The rights and remedies herein provided are cumulative and not exclusive of any other rights or remedies provided by any other instrument or by law.  No amendment, modification or waiver of any provision of this Agreement or any other Loan Document shall be effective unless the same shall be in writing and signed by the Agent and the Lenders.  No notice to or demand on the Borrower in any case

shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

11.9   Costs.   The Borrower agrees to pay to the Agent and other Lenders, if applicable, on demand all reasonable costs, fees and expenses (including without limitation reasonable attorneys' fees and legal expenses) incurred or accrued by the Agent in connection with the negotiation, preparation, execution, delivery, filing, recording and administration of this Agreement, the Security Instruments and the other Loan Documents, or any amendment, waiver, consent or modification thereto or thereof, or any enforcement thereof.  The Borrower further agrees that all such fees and expenses shall be paid regardless of whether or not the transactions provided for in this Agreement are eventually closed and regardless of whether or not any or all sums evidenced by the Revolver Notes are advanced to the Borrower by the Lenders.  Upon the Borrower's failure to pay all such costs and expenses within ten (10) days of the Agent's submission of invoices therefore, the Agent shall pay such costs and expenses by debit to the General Account of the Borrower without further notice to the Borrower.

11.10   Participation.   The Borrower recognizes and acknowledges that any Lender may sell participating interests in the Loans to one or more financial institutions (the "Participants") without the consent of Borrower in accordance with the provisions of **Section 10.3** hereof; provided, however, (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) any such Participant shall be entitled to the right of set-off contained in this Agreement, and (iv) the Borrower shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (v) Agent shall retain the sole right to enforce the obligations of Borrower and Mortgagor Affiliates relating to the Loan, the Revolver Notes and the Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers (i) decreasing the amount of principal of or the per annum contract rate at which interest is accruing and payable on the Loan or the Revolver Notes, (ii) extending any scheduled principal payment date or date fixed for the payment of interest on the Loan or Revolver Notes, (iii) extending the Commitment, or (iv) releasing the Borrower from its obligations and liabilities under the Loan Documents.  The Borrower hereby acknowledges that each Participant shall be deemed a holder of the Revolver Notes to the extent of its participation, and the Borrower hereby waives its right, if any, to offset amounts owing to the Lenders from the Borrower against any Participant's portion of the Revolver Notes.

**11.11   WAIVER OF JURY.   THE BORROWER FULLY, VOLUNTARILY AND EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THE REVOLVER NOTES, THIS AGREEMENT, THE SECURITY INSTRUMENTS OR UNDER ANY AMENDMENT, SUPPLEMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED (OR WHICH MAY IN THE FUTURE BE DELIVERED) IN CONNECTION HEREWITH OR ARISING FROM ANY BANKING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT.   THE BORROWER AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

2643850.11

11.12  Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Agent or any Lender or the Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Agent or Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any bankruptcy or other debtor relief law or otherwise, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

11.13  Full Agreement.  This Agreement and the other Loan Documents contain the full agreement of the parties and supersede all negotiations and agreements prior to the date hereof.

11.14  Headings.  The article and section headings of this Agreement are for convenience of reference only and shall not constitute a part of the text hereof nor alter or otherwise affect the meaning hereof.

11.15  Severability.  The unenforceability or invalidity as determined by a Tribunal of competent jurisdiction, of any provision or provisions of this Agreement shall not render unenforceable or invalid any other provision or provisions hereof.

11.16  Exceptions to Covenants.  The Borrower shall not be deemed to be permitted to take any action or fail to take any action which is permitted as an exception to any of the covenants contained herein or which is within the permissible limits of any of the covenants contained herein if such action or omission would result in the breach of any other covenant contained herein.

11.17  Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument.

11.18  Conflict with Security Instruments.  To the extent the terms and provisions of any of the Security Instruments are in conflict with the terms and provisions hereof, this Agreement shall be deemed controlling.  Reference is made to any Intercreditor Agreement entered into on or after the date hereof as contemplated by this Agreement with the Swap Counterparty, and notwithstanding any other agreement, each of the Borrower and the Agent (a) acknowledge that it has received a copy of such Intercreditor Agreement, (b) consents to the priority of payments and of Liens provided for in any such Intercreditor Agreement, and (c) agrees that it will be bound by and will take no actions contrary to the provisions of any such Intercreditor Agreement.

11.19  Recovery of Additional Costs.  If any Change in Law (defined below) shall impose, modify, or make applicable any taxes (except federal, state, or local income or franchise taxes imposed on Agent or the Lenders), reserve requirements, deposit requirements, capital adequacy requirements, Federal Deposit Insurance Corporation (FDIC) deposit insurance premiums or assessments, or other obligations which would (A) materially increase the cost to Agent and/or the Lenders for extending, maintaining or funding the Commitments, (B) reduce the amounts payable to the Lenders under the Commitment, or (C) reduce the rate of return on

Lenders' capital as a consequence of Lenders' obligations with respect to the Commitment, then the Borrower agrees to pay Lenders such additional amounts as will compensate Lenders therefor, within five (5) days after Lenders' written demand for such payment. Lenders' demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by the Borrower, which explanation and calculations shall be conclusive in the absence of manifest error. "Change in Law" means the occurrence after the date of this Agreement of: (a) the adoption or effectiveness of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application by any court or administrative or governmental authority of any law, rule, regulation or treaty, or (c) the making or issuance by any court or administrative or governmental authority of any request, rule, policy, guideline or directive, whether or not having the force of law; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives concerning capital adequacy promulgated by Lenders for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the US or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

11.20   Indemnification. Each Borrower agrees to indemnify and hold harmless Agent, Lenders and Letter of Credit Issuer, and their respective officers, directors, trustees, employees, agents, and advisors (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees, disbursements and other charges) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation, or proceeding and regardless of whether such Indemnified Party is a party thereto or preparation of defense in connection therewith) the Loan Documents or any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Loans, except to the extent such claim, damage, loss, liability, cost, or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this **Section 11.20** applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by Borrower, its respective Subsidiaries, directors, shareholders or creditors or an Indemnified Party or any other Person or any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Borrower agrees not to assert any claim against Agent, Lenders or Letter of Credit Issuer, or any of them, or any of their respective directors, officers, employees, attorneys, agents, and advisors, on any theory of liability, for special, indirect, consequential, or punitive damages arising out of or otherwise relating to the Loan Documents, any of the transactions contemplated herein or therein or the actual or proposed use of the proceeds of the Loans. Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and Indebtedness of Borrower contained in this **Section 11.20** shall survive the repayment of the Loans, the Indebtedness and other Indebtedness under the Loan Documents and the termination of the Commitments hereunder.

59

11.21   Government Regulations. Borrower shall not (1) be or become subject at any time to any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list) that prohibits or limits Agent, Lenders or Letter of Credit Issuer from making any loan advance or extension of credit to Borrower or from otherwise conducting business with Borrower, or (2) fail to provide documentary and other evidence of Borrower's identity as may be requested by Agent, Lenders or Letter of Credit Issuer at any time to enable Agent, Lenders and Letter of Credit Issuer to verify Borrower's identity or to comply with any applicable law or regulation, including without limitation, **Section 326** of the USA Patriot Act of 2001, 31 U.S.C. **Section 5318**.

**11.22   WAIVER OF SPECIAL DAMAGES. EACH BORROWER WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT SUCH BORROWER MAY HAVE TO CLAIM OR RECOVER FROM THE AGENT, THE LENDERS, OR THE LETTER OF CREDIT ISSUER IN ANY LEGAL ACTION OR PROCEEDING ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.**

11.23   USA PATRIOT Act Notice. IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. What this means for Borrower: When Borrower opens an account, such Lender will ask for Borrower's name, residential address, tax identification number, and other information that will allow such Lender to identify Borrower, including Borrower's date of birth if Borrower is an individual. Lender may also ask, if Borrower is an individual, to see Borrower's driver's license or other identifying documents, and, if Borrower is not an individual, to see Borrower's legal organizational documents or other identifying documents. Each Lender will verify and record the information such Lender obtains from Borrower pursuant to the USA PATRIOT Act, and will maintain and retain that record in accordance with the regulations promulgated under the USA PATRIOT Act.

11.24   Common Enterprise. The successful operation and condition of each of the Borrower, its entity Affiliates and Subsidiaries (collectively, the "Loan Parties") is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole. Each Borrower and Guarantor expects to derive benefit (and its board of directors, managers or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrower hereunder, both in their separate capacities and as members of the group of companies. Each Borrower and Guarantor as determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Borrower or Guarantor is within its purpose, will be of direct and indirect benefit to such Borrower or Guarantor, and is in its best business and economic interest.

11.25   Not a Reportable Transaction. The parties signatory hereto acknowledge and stipulate and Borrower represents to Agent and Lenders that the transactions contemplated by

60

this Agreement do not constitute a "Reportable Event" as that term is described and defined in regulations of the Treasury Department of the United States.

11.26   Electronic Execution.   This Agreement and the other Loan Documents may be executed pursuant to the Oklahoma Uniform Electronic Transactions Act, 12A Oklahoma Statutes, Article 15, **Sections 101** et seq., and, if so, shall be governed by such Act.   Such execution shall not affect the validity of any of the Loan Documents that are executed other than pursuant to the Uniform Electronic Transactions Act.   Such party or parties thereafter shall forward an executed copy of such original executed document(s) to Agent.

[Signatures on following page.]

61

IN WITNESS WHEREOF, the parties hereto have caused this Second Amended and Restated Revolving Credit Agreement to be duly executed and delivered in Tulsa, Oklahoma, effective as of the day and year first above written.

"Borrower"

**NBI PROPERTIES, INC.**
an Oklahoma corporation

By

Richard J. Nichols, President

**N B I SERVICES, INC.**
an Oklahoma corporation

By

Richard J. Nichols, President

62

"Agent" and "Lender"

**CROSSFIRST BANK**

By_____

Henry Smith, Vice President/Energy Bank

CrossFirst Bank
7120 South Lewis Avenue
Tulsa, Oklahoma 74136
918.497.5225
henry.smith@crossfirstbank.com

Credit Agreement Signature Page

2643850.11

"Lender"

KIRKPATRICK BANK

By: _____

Shawn D. Brewer, Senior Vice President

Kirkpatrick Bank
15 East 15th Street
Edmond, Oklahoma 73013
405.341.8222
sbrewer@kirkpatrickbank.com

Credit Agreement Signature Page

2643850.9

"Lender"

**COMMUNITY TRUST BANK**

By: _____
      Jerry A. Horton, III, Vice President

Community Trust Bank
3838 Oak Lawn Avenue
Suite 1700
Dallas, Texas 75219
214.253.2546
jhorton@ctbonline.com

Credit Agreement Signature Page

"Lender"

**VALLEY NATIONAL BANK**

By: _____
Colt Brooke, Vice President

Valley National Bank
4912 East 81st Street
Tulsa, Oklahoma 74155
918.524.3670
ColtB@bankvnb.com

Credit Agreement Signature Page

2643850.9

## LIST OF EXHIBITS

### EXHIBITS

Exhibit A      Revolving Loan Advance Request (§ 2.3)

Exhibit B      Compliance Certificate (6.6(b))

Exhibit C      Liabilities (§ 6.19)

Exhibit D      Pending Litigation (§ 7.2)

Exhibit E      Take or Pay Disputes (§ 7.19)

Exhibit F      Assignment by Lender (10.2(d))

Exhibit G      Additional Lender Commitment (§10.4)

### SCHEDULES

Schedule I      Lenders' Commitments

Exhibits and Schedules

2643850.11

**EXHIBIT A**

(§ 2.3)

LOAN ADVANCE REQUEST

CrossFirst Bank, Agent
7120 South Lewis
Tulsa, Oklahoma 74136
Attn: Henry Smith, Vice President
Ladies and Gentlemen:

  Pursuant to the provisions of the Revolving Credit Agreement dated as of December 18, 2014, as amended from time to time (collectively, the "Credit Agreement"), between and among NBI PROPERTIES, INC. and N B I SERVICES, INC. (collectively, the "Borrower"), the Lenders signatory parties thereto and CrossFirst Bank (the "Agent"), the undersigned Borrower hereby (i) confirms and ratifies the Agent's continuing first and prior security interest and mortgage lien in and to all of the Collateral (including proceeds thereof) described or referred to in the Credit Agreement or in the Security Instruments described therein; (ii) applies to the Lenders pursuant to **Section 2.3** of the Credit Agreement for a Revolving Credit Loan advance on the Revolver Notes in the aggregate amount of $_____; (iii) certifies that no Event of Default or Default under the Credit Agreement has occurred and is continuing as of the date hereof or exists or would continue to exist but for the lapse of time or giving of notice, or both; (iv) represents and warrants to the Agent and the Lenders that the representations, covenants and warranties set forth or referred to in the Credit Agreement are true and correct on and as of this date, and (v) represents to the Agent and the Lenders that the Borrower is in compliance with the Collateral Borrowing Base and the Collateral Borrowing Base calculations and limitations set forth in the Credit Agreement (taking into account the amount of the Revolving Credit Loan advance requested pursuant hereto).

<div style="margin-left:40%">

NBI PROPERTIES, INC., and
N B I SERVICES, INC.
each an Oklahoma corporation


By _____
Name: _____
Title: _____


(the "Borrower")

</div>

A-1

## EXHIBIT B

### (6.6(b)) -Form of Compliance Certificate

Pursuant to the Revolving Credit Agreement dated effective as of December 18, 2014 (as the same may at any time hereafter be amended, supplemented or modified and in effect being herein collectively called the "Credit Agreement"), between and among **N B I Services, Inc., and NBI Properties, Inc.,** each an Oklahoma corporation (collectively, the "Borrower"), and **CrossFirst Bank** ("Agent"), Borrower has reviewed its activities for the fiscal quarter ended on _____, 201_, (the "Compliance Date"), and hereby represents and warrants to Agent that the information set forth below is true and correct as of the Compliance Date (capitalized terms not otherwise defined herein shall have the meanings assigned in the Credit Agreement):

| | | Required | Actual |
|---|---|---|---|
| 1. | <u>Financial Covenants.</u> | | |
| **Section 6.28** | Interest Coverage Ratio (minimum) | 4.0 to 1.0 | ____ to 1.0 |
| **Section 6.29** | – Funded Debt to EBITDAX (maximum) | 4.00 to 1.0 | ____ to 1.0 |

2.      Borrower hereby certifies to Agent that as of the Compliance Date:

❑      Schedule 1 attached to this Compliance Certificate sets forth a true and complete list of all existing ISDA Agreements and Hedge Transactions of Borrower, the material terms thereof (including the type, term, effective date, termination date, and notional volumes and prices), the net mark-to-market value thereof, all credit support agreements relating thereof (including any margin required or supplied), and the counter-party to each such Hedge Transactions.

❑      As of the Compliance Date, Borrower has no outstanding Hedge Transactions with any parties.

❑      As of the Compliance Date, Borrower has entered into no existing ISDA Agreements with any parties.

3.      The undersigned company representative hereby certifies to Agent that

the financial statements delivered with this certificate in accordance with **Section 6.6(a)** of the Credit Agreement fairly present in all material respects the results of operations and financial condition of Borrower as of the dates and the accounting period covered by such financial statements;

I have reviewed the terms of the Credit Agreement and have made, or caused to be made under my supervision, a review in reasonable detail of the transactions and conditions of Borrower during the accounting period covered by such financial statements;

such review has not disclosed the existence during or at the end of such accounting period, and I have no knowledge of the existence as of the date hereof, of any

B-1

condition or event that constitutes a Default or an Event of Default or an event that would, with the lapse of time or giving of notice, or both, be an Event of Default;

Borrower is in compliance with the financial covenants contained in **Article VI** of the Credit Agreement, as demonstrated by the calculation of such covenants above;

The Revolver Notes, the Credit Agreement and the Security Instruments are acknowledged, ratified, confirmed, and agreed by Borrower to be valid, subsisting, and binding obligations; and

Borrower agrees that there is no right to set off or defense to payment of the Revolver Note or any other Indebtedness (as defined in the Credit Agreement).

This Quarterly Compliance Certificate is dated as of _____, 20__.

<div align="center">

**NBI SERVICES, INC. and
N B I PROPERTIES, INC.**

</div>

By: _____
_____(name)
_____(title)

"Borrower"

<div align="center">

B-2

</div>

**EXHIBIT C**

(§ 6.19)

**LIABILITIES**

**NONE.**

C-1

# EXHIBIT D

## (§ 7.2)

## PENDING LITIGATION

2643850.11

# EXHIBIT E

(§ 7.19)

## TAKE OR PAY DISPUTES

**NONE.**

**EXHIBIT F**

(Assignment and Acceptance Agreement)

**FORM OF ASSIGNMENT**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between [Insert name of Assignor] (the "Assignor") and [Insert name of Assignee] (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Revolving Credit Agreement dated as of December 18, 2014 (as amended, restated or supplemented from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

The Assignor hereby sells and assigns to the Assignee, and the Assignee hereby purchases and assumes from the Assignor, an interest in and to the Assignor's rights and obligations under the Credit Agreement and the other Loan Documents, such that after giving effect to such assignment the Assignee shall have purchased pursuant to this Assignment Agreement the percentage interest specified in Item 6(a) below of all outstanding rights and obligations under the Credit Agreement and the other Loan Documents relating to the credit facility listed in Item 5 below (the "Assigned Interest"). The aggregate Commitment (including Letter of Credit Exposure, if the applicable Commitment has been terminated) purchased by the Assignee hereunder is set forth in Item 6 below.

In consideration for the sale and assignment of Commitments hereunder, the Assignee shall pay the Assignor, on the Effective Date, the amount agreed to by the Assignor and the Assignee. On and after the Effective Date, the Assignee shall be entitled to receive all payments of principal, interest, reimbursement obligations and fees with respect to the interest assigned hereby. The Assignee will promptly remit to the Assignor any interest on Loans and fees received from the Administrative Agent which relate to the portion of the Loans or LC Obligations assigned to the Assignee hereunder and not previously paid by the Assignee to the Assignor. In the event that either party hereto receives any payment to which the other party hereto is entitled under this Assignment Agreement, then the party receiving such amount shall promptly remit it to the other party hereto.

1.    Assignor: _____

2.    Assignee: _____ [and is an Affiliate of _____
       [identify Lender]

3.    Borrower:  N B I Services, Inc. and NBI Properties, Inc., each an Oklahoma corporation

4.    Administrative Agent:  CrossFirst Bank, as Administrative Agent under the Credit Agreement.

5.    Credit Agreement: Revolving Credit Agreement dated as of December 18, 2014 among Borrower, CrossFirst Bank, as Administrative Agent, and the Lenders signatory parties

F-1

2643850.11

thereto ($75,000,000.00 Maximum Revolver Commitment Amount, subject to the then applicable Revolver Commitment Amount).

6.    Assigned Interest:        _____

    a.    Assignee's Pro Rata Share of credit facility        _____%
        purchased under the Assignment Agreement

    b.    Amount of credit facility purchased under the    $_____
        Assignment Agreement

    c.    Assignee's Loans (or LC Exposure with respect to    $_____
        terminated Commitments) purchased hereunder:

7.    Trade Date: _____

8.    Payment Instructions to Assignor:

Effective Date: _____, 201__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER BY THE ADMINISTRATIVE AGENT.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

[name]

BY:_____
Title:_____


ASSIGNEE

[name]

BY:_____
Title:_____


Consented and Accepted:

CrossFirst Bank,
as Administrative Agent for the Lenders

By:_____
Name: _____
Title: _____


N B I SERVICES, INC. and
NBI PROPERTIES, INC.

By::_____
      Name: _____
      Title: _____

F-3

## EXHIBIT G

FORM OF AMENDMENT FOR AN INCREASED AND/OR
ADDITIONAL LENDER COMMITMENT

This AMENDMENT is made as of the [__] day of [_____], 20___, by and among NBI PROPERTIES, INC. and N B I SERVICES, INC., each an Oklahoma corporation (collectively, the "Borrower"), CROSSFIRST BANK, as administrative agent under the "Credit Agreement" (as defined below) for the Lenders signatory party thereto ("Agent"), and _____ _____ (the "Additional Lender").

Borrower, Agent and certain Lenders, as described therein, are parties to a Revolving Credit Agreement dated as of December 18, 2014 (as amended, supplemented, or restated from time to time, collectively the "Credit Agreement"). All terms used herein and not otherwise defined shall have the same meaning given to them in the Credit Agreement.

Pursuant to **Section 10.4** of the Credit Agreement, Borrower has the right to increase the amount of the aggregate Commitment by obtaining one or more additional Commitments upon satisfaction of certain conditions. This Amendment requires only the signature of Borrower, Agent and the Additional Lender so long as the Maximum Revolver Commitment Amount is not increased above the aggregate amount permitted by the Credit Agreement.

The Additional Lender is either (a) an existing Lender which is increasing its Commitment or (b) a new Lender which is a lending institution whose identity Agent will approve by its signature below.

In consideration of the foregoing, such Additional Lender, from and after the date hereof shall have a **[Commitment of $_____ and if it is a new Lender, the Additional Lender hereby assumes all of the rights and obligations of a Lender under the Credit Agreement.]**

Borrower has executed and delivered to the Additional Lender as of the date hereof, if requested by the Additional Lender, a new or amended and restated Revolver Note defined and described in the Credit Agreement and in form, scope and substance acceptable to Agent and the Additional Lender to evidence the new or increased Commitment of the Additional Lender.

By execution hereof, the Additional Lender agrees to be bound by the terms, provisions, conditions and limitations of the Credit Agreement with the same force and effect as if such Additional Lender were an original signatory party thereto.

[Signature on following page.]

G-1

2643850.11

IN WITNESS WHEREOF, Agent, Borrower and the Additional Lender have executed this Amendment as of the date shown above.

**NBI PROPERTIES, INC. and
N B I SERVICES, INC.,**
each an Oklahoma corporation

By: _____
_____(name)
_____(title)

"Borrower"


[_____]


By: _____
_____(name)
_____(title)

"Additional Lender"


**CROSSFIRST BANK**


By: _____
_____(name)
_____(title)

"Agent"

G-2

## SCHEDULE I

### LENDERS' COMMITMENTS

| Lender | Percentage Held | Revolver Commitment |
|---|---|---|
| CrossFirst Bank | 40.00% | $20,000,000.00 |
| Community Trust Bank | 30.00% | 15,000,000.00 |
| Kirkpatrick Bank | 20.00% | 10,000,000.00 |
| Valley National Bank | 10.00% | 5,000,000.00 |
| **TOTALS** | **100.00000%** | **$50,000,000.00** |

2643850.11